**Doug JAGER and William Jager, Plaintiffs–Appellants, Cross–Appellees,**

v.

**DOUGLAS COUNTY SCHOOL DISTRICT, et al., Defendants–Appellees, Cross–Appellants.**

**Doug JAGER, William Jager, Plaintiffs–Appellees, Cross–Appellants,**

v.

**DOUGLAS COUNTY SCHOOL DISTRICT, Douglas County Board of Education, Defendants–Appellants, Cross–Appellees.**

Nos. 87–8522, 87–8719.

United States Court of Appeals, Eleventh Circuit.

Jan. 3, 1989.

---

Jeffrey O. Bramlett, Bondurant, Mixson & Elmore, Carolyn R. Gorwitz, Ralph Goldberg, Atlanta, Ga., for Jager.

Frank C. Jones, King & Spalding, Gary J. Toman, Stephanie E. Parker, Atlanta, Ga., Clifton & Helms, Marshall L. Helms, Jr., Lithia, Springs, Ga., for Douglas County School Dist.

Before RONEY, Chief Judge, JOHNSON, Circuit Judge, and PECK *, Senior Circuit Judge.

* Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

**JOHNSON, Circuit Judge:**

This case involves invocations which are delivered prior to public high school football games in Douglas County, Georgia. These football games are school-sponsored activities which are played at a stadium owned by the school system. The schools furnish the equipment used by the participants, and the coaches who supervise these activities are employed by the school system. Taxpayer funds are used to pay the operating costs for the stadium lights and public address system. We hold that the practice of beginning these games with an invocation violates the Establishment Clause of the First Amendment.

## I. FACTS

In the fall of 1985, Doug Jager, then a member of the Douglas County High School marching band,[1] objected to his school principal about the practice of having pregame invocations delivered at home football games.[2] The invocations often opened with the words "let us bow our heads" or "let us pray" and frequently invoked reference to Jesus Christ or closed with the words "in Jesus' name we pray." These invocations conflict with the Jagers' sincerely held religious beliefs.[3] The Douglas County High School principal informed the band director of Doug Jager's objections to the prayers. The band director proceeded to lecture Doug on Christianity.

On June 2, 1986, Douglas County School Superintendent Kathryn Shehane, the school system attorney, the Jagers and

1. Doug Jager has now graduated from high school. He and his father, William Jager, continue this suit as taxpayers and as people who attend the football games. In addition, Mark Jager (William's other son) attends Douglas County High School and plays in the marching band.

2. Pregame invocations have been given at Douglas County High School football games at least since 1947. From 1947 to September 1986, an announcer would introduce the invocation speaker, usually identifying the church of affiliation. Student government initially invited invocation speakers. Starting in 1950, local ministers began to give the invocations. In the early 1970s, an assistant football coach delegated the task of furnishing invocation speakers to Reverend Leon Jeffords, a Presbyterian clergyman. From the early 1970s through 1986, Jeffords recruited invocation speakers through the Douglas County Ministerial Association, a group of ordained clergy whose membership consisted exclusively of Protestant Christian ministers. With perhaps five exceptions, Protestant Christian clergymen gave every invocation delivered at Douglas County High School games from 1974 to 1986.

3. The Jagers are Native Americans.

their counsel, and Reverends Jamie E. Jenkins and Donald Mountain of the Douglas County Ministerial Association ("DCMA") met and discussed two alternative proposals for modifying the invocation practices: an inspirational wholly secular speech and an "equal access" plan that would retain some religious content. The Jagers rejected the equal access approach, and notified the school system attorney that the secular inspirational speech was the only feasible alternative to the invocation practice. Upon the Jagers' rejection of the equal access plan, Reverends Jenkins and Mountain drafted a compromise proposal. The stated purpose of the alternative draft was to "perpetuate and regulate the traditional invocation as part of the opening ceremonies of school athletic events." R1–24–16. In August 1986, the plaintiffs agreed to reconsider the Jenkins/Mountain version of the equal access plan if prayers voluntarily ceased at football games in the interim.

In September 1986, Superintendent Shehane met with the principals of Douglas County high schools. The group decided to proceed with pregame invocations pursuant to the equal access plan. On September 15, 1986, the high school principals informed their schools that the equal access plan, which the district court found to be coextensive with the Jenkins/Mountain plan, would govern future games, including those scheduled for September 26, 1986.[4]

Under the terms of the equal access plan, all school clubs and organizations can designate club members to give invocations, and any student, parent or school staff member can seek to deliver an invocation. The plan specifies that the student government will randomly select the invocation speaker, and no ministers will be involved in selecting invocation speakers or in delivering invocations. In addition, the schools will not monitor the content of the invocations.[5]

On September 19, 1986, the Jagers filed a complaint in the United States District Court for the Northern District of Georgia. The district court issued a temporary restraining order enjoining the Douglas County School District ("the School District") from conducting or permitting religious invocations prior to any athletic event at the school stadium.

The case was tried to the district court in November 1986. On February 3, 1987, the district court (1) declared the pregame invocations unconstitutional, (2) denied the Jagers' request for a permanent injunction, (3) rejected the Jagers' claim based on the Free Exercise of Religion Clause of the First Amendment,[6] and (4) rejected the Jagers' claim that the School District violated the Georgia Constitution.

After the School District filed a Motion for Clarification, the district court entered an additional order in which it held that the equal access plan was constitutional on its face and did not violate the Establishment Clause. The court expressly declined to determine whether the equal access plan was unconstitutional as applied. The district court denied the Jagers' request for declaratory and injunctive relief relating to the equal access plan.

---

4. Although the Douglas County Board of Education never formally adopted a policy concerning pregame invocations, the School District does not deny that the school superintendent met with the school principals and instructed them to follow the equal access plan. The school superintendent testified that, after she and the principals decided to proceed in accordance with the equal access plan, the principals informed their respective student bodies that the equal access plan would be the method by which pregame invocation speakers would be chosen. R5–90–91. Therefore, the plan was enacted by those with authority to do so.

5. As noted above, the district court found that the School District's equal access plan was

"coextensive" with the Jenkins/Mountain plan. The School District does not dispute this. In fact, the Jenkins/Mountain plan, which stated that its purpose was to "perpetuate and regulate the traditional invocation as part of the opening ceremonies of school athletic events," was introduced into evidence as Plaintiff's Exhibit 2. At trial, the school superintendent referred to the Jenkins/Mountain plan (that is, Exhibit 2) as the equal access plan which she and the principals enacted. See R5–90–91. Thus, the specifics of the equal access plan are defined in the record.

6. The Jagers do not appeal this determination.

On June 2, 1987, the district court determined that the Jagers were "prevailing parties" under 42 U.S.C.A. § 1988 and thus were entitled to attorneys' fees. On August 31, 1987, the district court awarded attorneys' fees, after decreasing the amount sought by the Jagers by 25%. The appeals and cross-appeals from the district court's orders on the merits and on the question of attorneys' fees were then consolidated.

## II. DISCUSSION

### A. *Equal Access Plan's Facial Validity*

The district court held that the equal access plan, which involves the random selection of an invocation speaker, was constitutional on its face. The Jagers challenge this holding on appeal.

■ The Establishment Clause of the First Amendment forbids the enactment of any law or practice "respecting an establishment of religion." [7] U.S. Const. Amend. I. The religion clauses of the First Amendment require that states "pursue a course of complete neutrality toward religion." *Wallace v. Jaffree*, 472 U.S. 38, 60, 105 S.Ct. 2479, 2491, 86 L.Ed.2d 29 (1985) ("*Jaffree II* "). To determine whether state action embodies the neutrality that comports with the Establishment Clause, this Court must apply a three-pronged analysis. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). We must ask whether (1) the Douglas County School Superintendent and the school principals had a secular purpose for adopting the equal access plan, (2) the plan's primary effect is one that neither advances nor inhibits religion, and (3) the plan does not result in an excessive entanglement of government with religion. *Id.* at 612–13, 91 S.Ct. at 2111. State action violates the Establishment Clause if it fails to meet any of these three criteria. *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

The School District argues that the *Lemon* test does not apply here. Instead, the School District contends that *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), provides the standard for determining whether the equal access plan violates the Establishment Clause. In *Marsh*, the Supreme Court upheld Nebraska's practice of commencing state legislative sessions with a prayer delivered by a chaplain employed by the state. In refusing to declare Nebraska's legislative invocation unconstitutional, the Court relied on the "unique history" associated with the practice of opening legislative sessions with a prayer. *Id.* at 791, 103 S.Ct. at 3335–36. The practice existed at the time of the adoption of the First Amendment and had continued in many states to the present. *See id.* at 792, 103 S.Ct. at 3336 ("In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society."). Since the Continental Congress and the First Congress opened their sessions with prayers, the *Marsh* Court concluded that the drafters of the Establishment Clause undoubtedly perceived no threat from legislative prayer and did not intend to prohibit legislative invocations. *Id.* at 791, 103 S.Ct. at 3335–36.

■ Because *Marsh* was based on more than 200 years of the "unique history" of legislative invocations, it has no application to the case at bar. The instant case involves the "special context of the public elementary and secondary school system," *Edwards*, 107 S.Ct. at 2577, in which the Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause." *Id.* As the Supreme Court recently explained:

[t]he *Lemon* test has been applied in all cases since its adoption in 1971, except in *Marsh v. Chambers*, where the Court

---

7. The Establishment Clause applies to the states. *Everson v. Board of Education*, 330 U.S. 1, 8, 67 S.Ct. 504, 507–08, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). In addition, as long as state action is present, the reach of the Establishment Clause is not limited by a lack of statutory authorization. *See Smith v. Board of School Comm'rs*, 827 F.2d 684, 689 n. 3 (11th Cir.1987).

held that the Nebraska legislature's practice of opening a session with a prayer by a chaplain paid by the State did not violate the Establishment Clause. The Court based its conclusion in that case on the historical acceptance of the practice. Such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted.

*Edwards,* 107 S.Ct. at 2577 n. 4 (citations omitted).[8] Similarly, the present case does not lend itself to *Marsh*'s historical approach because invocations at school-sponsored football games were nonexistent when the Constitution was adopted. Therefore, the *Lemon* test guides this Court's analysis in the case at bar.[9]

### 1. *Secular Purpose*

■ The first prong of the *Lemon* test asks whether the challenged practice had a secular purpose. "In applying the purpose test, it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion.'" *Jaffree II,* 472 U.S. at 56, 105 S.Ct. at 2489 (quoting *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). Clearly, the equal access plan in the case at bar was adopted with the actual purpose of endorsing and perpetuating religion.

The district court found that pregame invocations serve four purposes: (1) to continue a longstanding custom and tradition, (2) to add a solemn and dignified tone to the proceedings, (3) to remind the spectators and players of the importance of sportsmanship and fair play,[10] and (4) "to satisfy the genuine, good faith wishes on the part of a majority of the citizens of Douglas County to publicly express support for Protestant Christianity." R1–24–19. The School District could serve all of its cited secular purposes by requiring wholly secular inspirational speeches about sportsmanship, fair play, safety, and the values of teamwork and competition.[11] In-

8. At the end of this past term, the Supreme Court applied the *Lemon* test in a case involving federal funding of religiously affiliated organizations that operate programs to help reduce the problems associated with teenage pregnancy. *See Bowen v. Kendrick,* —— U.S. ——, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

9. The Sixth Circuit recently held that *Marsh* governed the analysis of the validity of invocations and benedictions at high school graduation ceremonies. *Stein v. Plainwell Community Schools,* 822 F.2d 1406 (6th Cir.1987). However, *Stein* did not address the limitations placed on *Marsh* by the Supreme Court in *Edwards*. In fact, *Stein* did not even mention *Edwards*. The Sixth Circuit overlooked that *Marsh* was grounded in historical practice which dates from the time of the drafting of the Constitution. As *Edwards* indicates, *Marsh* created an exception to the *Lemon* test only for such historical practice. There is no rationale for applying this limited, historically-based exception to religious invocations that occur prior to high school football games.

Likewise, *Van Zandt v. Thompson,* 839 F.2d 1215 (7th Cir.1988), is inapposite here. *Van Zandt* involved an Establishment Clause challenge to the Illinois state legislature's decision to provide a prayer room in the state capitol building. The Seventh Circuit applied the *Marsh* test and concluded that there was no violation of the Establishment Clause. The *Van Zandt* court's decision to extend the *Marsh* test to the case of a prayer room in the state capitol building can be understood because both cases dealt with legislative prayer issues. However, *Van Zandt*'s adoption of the *Marsh* test is irrelevant in the present case involving public schools.

10. The district court issued a temporary restraining order against invocations during the 1986 season. Despite the fact that no invocations were delivered during the 1986 season, the district court found that "the School System experienced no measurable increase in fan violence, rowdiness or unsportsmanlike behavior." R1–24–18.

11. The district court found that the School District cited no secular purposes for the invocations until after the Jagers filed suit. In fact, at the September 23, 1986 hearing which ultimately led to the district court's issuing a temporary restraining order, the following conversation occurred between the court and the school system attorney:

> COURT: Does the practice of invocations in the Douglas County stadium that we are talking about have any secular purpose?
> MR. HELMS: *It has no secular purpose whatsoever, Your Honor.*

R4–33 (emphasis added). Attorney Helms went on to explain that:

> The whole football program is wholly secular from start to finish, and I submit that the ... injection or the beginning of that two or three

deed, the Jagers offered to accept a pre-game invocation consisting of a secular inspirational speech. Since the School District rejected this compromise even though it would have fulfilled the three secular purposes of pregame invocations, it is clear that the School District was most interested in the fourth purpose served by the invocations. That is, the School District wanted to have invocations that publicly express support for Protestant Christianity.

"The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests." *Karen B. v. Treen*, 653 F.2d 897, 901 (5th Cir. Unit A 1981), *aff'd mem.*, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982). In choosing the equal access plan, the School District opted for an alternative that permits religious invocations, which by definition serve religious purposes, just like all public prayers. *See Jaffree v. Wallace*, 705 F.2d 1526, 1534 (11th Cir.1983) ("Recognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied...."), *aff'd*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) ("*Jaffree I*"). The School District's rejection of the alternative of wholly secular invocations makes it very clear that the School District's actual purpose in having pregame invocations was religious. Consequently, the equal access plan fails to survive the *Lemon* test.

The conclusion that an intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test finds support in other cases. In *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), the Supreme Court held that Kentucky's statute requiring the posting of a copy of the Ten Commandments in all public classrooms had no secular purpose. The Kentucky legislature required the follow-

ing notation in small print at the bottom of each copy of the Ten Commandments: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41, 101 S.Ct. at 193 (quoting Ky.Rev.Stat. § 158.178 (1980)). Nonetheless, the Supreme Court held that "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.* at 41, 101 S.Ct. at 194 (footnote omitted). Likewise, the facts in the present case demonstrate that, although the School District emphasized at trial the secular purposes behind the pregame invocations, the pre-eminent purpose behind having invocations was to endorse Protestant Christianity. This is prohibited by the Establishment Clause. *See Abington School Dist. v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963) (daily reading of Bible verses and Lord's Prayer in the public schools held unconstitutional, despite school district's assertion of such secular purposes as "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature"); *Graham v. Central Community School Dist.*, 608 F.Supp. 531, 535 (S.D.Iowa 1985) (striking down commencement invocation and benediction for lack of secular purpose). In light of the controlling case law and the nature of the challenged practice, we hold that, because the equal access plan fails to satisfy the first prong of the *Lemon* test, the plan violates the Establishment Clause of the First Amendment.

### 2. The Primary Effect

Even assuming, *arguendo*, that the equal access plan survives the first prong

hour period with the invocation does not convert the whole program to a non-secular event.
*Id.* Although Helms' explanation suggests that he did not mean to concede that one of the prongs of the *Lemon* test was not satisfied, his statement is consistent with our reading of the

record. While his admission does not constitute conclusive evidence that the pregame invocations fail the first prong of the *Lemon* test, the statement reinforces our conclusion that the actual purpose behind both the equal access plan and the prior invocation practice was to endorse Protestant Christianity.

of the *Lemon* test, we would still find that the plan is facially unconstitutional because it fails the primary effect prong of the *Lemon* test. "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Jaffree II*, 472 U.S. at 56 n. 42, 105 S.Ct. at 2489 n. 42 (quoting *Lynch*, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)).

■ In the present case, as noted above, the School District could satisfy its secular objectives by prescribing a strictly secular invocation. The equal access plan, however, permits religious invocations. When a religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school-owned facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation. *See Jaffree I*, 705 F.2d at 1534–35 ("The primary effect of prayer is the advancement of ones religious beliefs."). This message becomes even clearer when the context of these pregame prayers is understood. In the past, pregame invocation speakers at the Douglas County High School, with very few exceptions, have been Protestant Christian ministers. In addition, Protestant Christianity is the majority religious preference in Douglas County. Therefore, the likely result of the equal access plan will be the continuation of Protestant Christian invocations, which have been delivered since 1947. Moreover, the equal access plan places those attending football games in the position of participating in a group prayer. Consequently, the plan violates the primary effect prong of the *Lemon* test. *Accord Graham*, 608 F.Supp. at 536 ("invocation and benediction portions of defendant's commencement exercises have as their primary effect the advancement of the Christian religion").

### 3. *Entanglement*

On the face of the equal access plan, the School District is not entangled with religion at all. The School District does not monitor the content of the invocations, and the DCMA will no longer choose the invocation speakers or deliver the pregame prayers. Nonetheless, the lack of entanglement cannot save the equal access plan because the plan violates the first two prongs of the *Lemon* test.

### 4. *The School District's Arguments*

The School District sets forth several arguments for distinguishing school prayer cases, claiming that these distinctions permit a finding that religious invocations at high school football games are constitutional. The School District first argues that the school prayer cases are not implicated here because pregame invocations occur outside the instructional environment of the classroom. This argument is meritless. Even though not occurring in the classroom, the invocations take place at a school-owned stadium during a school-sponsored event. In *Doe v. Aldine Ind. School Dist.*, 563 F.Supp. 883 (S.D.Tex.1982), the United States District Court for the Southern District of Texas rejected the argument that the School District asserts here. In *Doe*, a public high school sponsored extracurricular activities at which a prayer was sung. The defendants argued that the prayer did not violate the Establishment Clause because it occurred outside the classroom. The *Doe* court rejected this argument:

> Pep rallies, football games, and graduation ceremonies are considered to be an integral part of the school's extracurricular program and as such provide a powerful incentive for students to attend.... "[I]t is the Texas compulsory education machinery that draws the students to the school event and provides any audience at all for the religious activities...." Since these extracurricular activities were school sponsored and so closely identified with the school program, the fact that the religious activity took place in a nonreligious setting might create in a student's mind the impression that the state's attitude toward religion lacks neutrality.

*Id.* at 887 (citation omitted). The *Doe* court's reasoning applies equally well in the present case.

The School District next contends that football invocations do not invoke the teacher-student relationship, and are directed to a far less impressionable audience of adults and sixteen-to-eighteen year olds. However, the equal access plan does permit teachers to deliver religious invocations, thereby impacting on the teacher-student relationship. Furthermore, to persons of any age who do not believe in prayer, religious invocations permitted by the equal access plan convey the message that the state endorses religions believing in prayer and denigrates those religions that do not. If these prayers are delivered by authority figures, such as teachers, as is possible under the equal access plan, the message endorsing prayer becomes even stronger.

■ The School District argues further that the invocations are constitutional because they are given at public events at which attendance is entirely voluntary. Courts upholding invocations at graduation ceremonies have stressed that attendance is voluntary. *See, e.g., Wood v. Mt. Lebanon Township School Dist.,* 342 F.Supp. 1293, 1294 (W.D.Pa.1972). However, the Supreme Court and this Court have *not* held that public prayer becomes constitutional when student participation is purely voluntary. *See Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962) ("Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause"); *see also Karen B. v. Treen,* 653 F.2d at 902. The School District attempts to distinguish these cases on the ground that they involved students who were compelled by law to be in attendance in the classrooms where prayer took place. The School District suggests that, because attendance at football games is voluntary, a constitutional violation is avoided. This argument lacks merit because whether the complaining individual's presence was voluntary is not relevant to the Establishment

Clause analysis. *Bell v. Little Axe Ind. School Dist. No. 70,* 766 F.2d 1391, 1405 (10th Cir.1985). The Establishment Clause focuses on the constitutionality of the state action, not on the choices made by the complaining individual.

■ The School District's final attempt to distinguish the school prayer cases centers on the contention that the invocations constitute a *de minimis* violation of the Establishment Clause because they last 60 to 90 seconds. *See Grossberg v. Deusebio,* 380 F.Supp. 285, 290 (E.D.Va.1974) (no Establishment Clause violation "from the brief periods allotted to the invocation and benediction contemplated as part of the graduation ceremony"). This approach is flawed. It is "no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment." *Schempp,* 374 U.S. at 225, 83 S.Ct. at 1573. The Establishment Clause does not focus on the amount of time an activity takes, but rather examines the religious character of the activity. *See Hall v. Bradshaw,* 630 F.2d 1018, 1021 (4th Cir. 1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981). As the Fourth Circuit recognized in *Bradshaw,* "[a] prayer, because it is religious, does advance religion, and the limited nature of the encroachment does not free the state from the limitations of the Establishment Clause." *Id.* at 1021.

None of the arguments offered by the School District are persuasive in the present case. Each alleged distinction overlooks the single fact that a state or its subdivision cannot endorse or advance religion. Nor can a state use religious means to achieve secular purposes where, as here, secular means exist to achieve those purposes.

In short, the equal access plan is unconstitutional because it has a religious purpose and a primary effect of advancing religion. By using a purely secular invocation, the School District could avoid any problems of entanglement, fulfill its secular purposes, and not advance religion, thereby complying with the requirements of *Lemon* and its progeny. Because the

School District rejected the alternative of a purely secular pregame speech, and instead adopted a plan which fails to satisfy the *Lemon* test, we hold that the equal access plan is unconstitutional on its face.

**B.** *Invocations Before Equal Access Plan Implemented*

The district court declared that the pregame invocation system that was in place prior to the "adoption" of the equal access plan [12] was unconstitutional. The School District contends that the question of the constitutionality of the invocation practices as they existed prior to the equal access plan was moot and, therefore, the district court lacked jurisdiction to make such a declaration. Alternatively, the School District argues that, if the issue was not moot, the district court erroneously declared the prior pregame invocation practice to be unconstitutional.

**1.** *Mootness*

The School District first raised mootness as a jurisdictional impediment when the district court prepared to award attorneys' fees to the Jagers. The district court rejected the School District's argument because it was not absolutely clear that the prior practice of having religious invocations given by DCMA ministers would not recur. *See United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).

■ Ordinarily, the defendant's voluntary cessation of a challenged practice will not moot an action because "the defendant is free to return to his old ways." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). In the case at bar, the district court held that:

the issue of the constitutionality of the pre-"equal access" plan practice of pregame prayer is not moot. In fact, the practice was temporarily enjoined by this court prior to adjudication on the merits. At no point during the hearing on the

motion by plaintiffs for a temporary restraining order or during the trial on the merits was the mootness argument raised. Both plaintiffs and defendants have steadfastly litigated the allegedly moot issue.

R2-48-3.

In arguing that the district court's holding was error, the School District seeks to distinguish *Concentrated Phosphate* and *W.T. Grant*. It contends that voluntary cessation in those cases occurred *after* the complaint was filed, whereas the Douglas County School Superintendent and the school principals decided to implement the equal access plan four days before the Jagers filed their complaint. This argument is unavailing. In *Hall v. Board of School Comm'rs*, 656 F.2d 999, 1000 (5th Cir. Unit B Sept.1981), this Court held that the defendant school board's voluntary cessation of morning devotionals upon learning that a lawsuit was going to be filed did not moot the plaintiff's Establishment Clause challenge to the practice. The *Hall* Court noted that the defendant school board had disputed the constitutionality of the practice up to the day of trial, when defense counsel indicated for the first time that the board had no intention of reviving the devotionals. Additionally, although the school superintendent knew that the practice was unconstitutional and had informed the school principals of this fact, he made no further attempt to ensure that all schools discontinued the practice. *Id.*

■ *Hall* controls the mootness issue in the present case. Under the imminent threat of the Jagers' lawsuit, the School District voluntarily ceased the practice of having pregame religious invocations delivered by Protestant ministers, and it implemented the equal access plan. However, the equal access plan was merely implemented by the school principals. It was not a formal policy adopted by the School District or the Douglas County Board of Education, and the defendants never prom-

---

**12.** As noted above, the Douglas County Board of Education has never formally adopted the equal access plan. Rather, the school superintendent and the principals decided to follow the plan at future games.

ised not to resume the prior practice.[13] In fact, the defendants continue to press on appeal that the voluntarily ceased conduct should be declared constitutional. Thus, as in *Hall*, the controversy concerning the prior invocation practices is not moot.

Because the School District's posture on appeal suggests it may revert to the practices it engaged in prior to the development of the equal access plan, the present case is distinguishable from *Saladin v. City of Milledgeville*, 812 F.2d 687, 693 (11th Cir. 1987). In *Saladin*, this Court held an action moot where the City voluntarily ceased displaying an official seal in which the word "Christianity" appeared, and it promised not to display the seal again in the future. Importantly, the Court noted that there was no indication that the City would break its word. *Id.* Conversely, in the present case, there is no indication that the School District will refrain from resuming its forty-year-old practice of having clergy deliver religious invocations before high school football games. Therefore, because *Hall*, not *Saladin*, controls the question of mootness, we will reach the merits of the Jagers' challenge to the pre-equal access plan practices.

### 2. *Merits*

■ The School District appeals the district court's declaration that the practice of having ministers give religious invocations violated the Establishment Clause. However, under the *Lemon* test,[14] this argument is without merit. First, the invocations were prayers, delivered by ministers, and thus fail the secular purpose prong of the *Lemon* test for the reasons set forth in Part A, *supra*. Second, the primary effect

of advancing religion was clear for the reasons given by the district court: "[o]ne of the effects of the prior practices in regard to invocations was to create the appearance or impression that the school system endorsed Protestant Christianity." Rl–24–19. The School District labels this finding clearly erroneous, but such a finding is inescapable where the person giving the invocation was identified by name and, frequently, by church affiliation. Third, excessive entanglement occurred because the School District delegated the authority to deliver invocations and to choose invocation speakers to the DCMA, a Protestant ministerial group. We therefore hold that the prior practice violated the Establishment Clause.[15]

### C. *Attorneys' Fees*

On June 2, 1987, the district court determined that the Jagers were a "prevailing party" within the meaning of 42 U.S.C.A. § 1988. On August 31, 1987, the district court awarded the Jagers approximately $66,000, consisting of attorneys' fees and costs. The plaintiffs' attorneys had submitted a figure of approximately $71,000 for attorneys' fees; however, the district court reduced this figure by 25%, for time related to the unsuccessful equal access plan claim. Because we find in favor of the plaintiffs on the equal access plan claim, we remand to the district court to determine an attorneys' fee award in light of this holding.

### III. CONCLUSION

In sum, we REVERSE the district court's order declaring the equal access

---

13. Superintendent Shehane stated that, if the schools were permitted to continue football invocations, she would "encourage" the school principals to adhere to the equal access plan. Since the school principals control access to the public address system at football games, there is no guarantee that the practice of having religious invocations delivered by ministers will not resume.

14. The School District again urges that *Marsh* should govern this Court's analysis. This argument fails for the reasons set forth in Part A, *supra*.

15. The Jagers also alleged a violation of article I, section 2, paragraph 7 of the Georgia Constitution, which provides:

No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, cult, or religious denomination or of any sectarian institution.

Because we hold that both the equal access plan and the pre-plan practices violated the Establishment Clause of the First Amendment to the United States Constitution, we find it unnecessary to decide the state constitutional issue.

plan constitutional on its face, and we AFFIRM the lower court's order declaring that the pregame invocations were unconstitutional. Because we award relief to the plaintiffs on both of their Establishment Clause claims, we REMAND to the district court to determine the amount of attorneys' fees to be awarded.

JOHN W. PECK, Senior Circuit Judge, concurring:

I concur in the result reached by the majority and with the choice of legal authority to support its position but write separately to express the haunting thought that the equal access plan comes across to me as a thinly veiled attempt to continue the forty-year-old traditional pre-game prayer format found unconstitutional by the district court. Indeed, the purpose statement by the Reverends Jenkins and Mountain, and apparently accepted by the superintendent, virtually assures the link with that tradition. The "equal access plan" is presented in fragmentary form in the record and we know of its contents principally from what the district court tells us it is in its February 3 order. Its sole content is the random selection of the speakers.

Perhaps even more enlightening is what the description does not include. It does not say that the content of the invocation will be wholly inspirational or purely secular or non-religious based. It is disturbing to speculate that the framers of the "plan" appear to have been counting on the fact that indeed it would not be so. Indeed the school officials rejected a wholly inspirational, secular concept proposed by the Jagers. A random selection of speakers in this case does not result in a variety of viewpoints or beliefs in an area in which there is a long-standing preponderance of adherence to Christian Protestantism.

Nevertheless, I concur in the result because despite the imprecision of the components, a study of the record has convinced me that the basic, underlying intentions of the parties must necessarily be essentially as determined by the district court in its original order and by the majority opinion.

RONEY, Chief Judge, dissenting:

I respectfully dissent. Realizing that the Court here has tried to faithfully follow the controlling authorities in this very difficult field of constitutional law, I nevertheless think that it has pushed the Establishment Clause further than it needs to be pushed to preserve the rights there sought to be protected, and that the district court properly determined that the facts here do not transgress the admonition against making a "law respecting the establishment of religion."

Before the opening kick-off at high school football games in Douglas County, Georgia, a minister, or more recently, a randomly selected student, parent or faculty member, delivers an "invocation." The majority holds that this practice violates the Establishment Clause. I am unwilling "to press the concept of separation of Church and State to these extremes," *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). I would affirm the district court's decision that the equal access plan violates neither the Georgia nor the United States Constitution; I would hold that the controversy involving the school's traditional practice was moot and vacate the declaratory decree on that issue; and I would reverse the plaintiffs' attorney's fee award on the ground that plaintiffs were not the prevailing party.

*Constitutionality of Equal Access Plan*

Establishment Clause cases present the difficult task of attempting to reconcile the constitutional prohibition against law respecting the establishment of religion with the American national identity as "a religious people whose institutions presuppose a Supreme Being." *Zorach*, 343 U.S. at 313, 72 S.Ct. at 684. Out of the "tangle of establishment clause doctrine," *Van Zandt v. Thompson*, 839 F.2d 1215, 1218 (7th Cir. 1988), emerge two distinct methods of analysis for such cases. The most established of these is the three-part inquiry formalized in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under this analysis, a challenged

practice will be upheld if: (1) it has a secular purpose; (2) its primary effect is neither to advance nor inhibit religion; and (3) it does not foster excessive Government entanglement in religion. *Id.* at 612–13, 91 S.Ct. at 2111.

The Supreme Court, however, has refused to be "confined to any single test or criterion in this sensitive area," *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984), and in a recent case, *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Court developed an alternative approach to Establishment Clause challenges. This approach, based on history and tradition, simply holds that there are certain practices which, although religious in nature, are not an establishment of religion or a step toward establishment, but are rather a "tolerable acknowledgment of beliefs widely held among the people of this country." *Id.* at 792, 103 S.Ct. at 3336. In *Marsh,* the Court upheld the Nebraska Legislature's use of a chaplain, hired and paid by the State, to deliver invocations at each session.

The scope of *Marsh* has not been defined. The fact that the *Lemon* analysis was employed in *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) and *Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), cases decided after *Marsh* involving Establishment Clause challenges in the public school context, indicates that *Marsh* is of limited utility in dealing with the issue of prayer in schools. *Edwards,* 107 S.Ct. at 2577 n. 4 ("[*Marsh*'s] historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually non-existent at the time the Constitution was adopted."). *Accord Graham v. Central Community School Dist. of Decatur County,* 608 F.Supp. 531, 535 (S.D.Iowa 1985) ("*Marsh* decision is a singular Establishment Clause decision that rests on the 'unique history' of legislative prayer, and the holding of that case is clearly limited to the legislative setting."); *Bennett v. Livermore Unified School Dist.,* 193 Cal.App.3d 1012, 238 Cal.Rptr. 819 (1987); *Kay v.*

*David Douglas School Dist. No. 40,* 79 Or.App. 384, 719 P.2d 875 (1986), *vacated as moot,* 303 Or. 574, 738 P.2d 1389 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 740, 98 L.Ed.2d 775 (1988). *See also Smith v. Board of School Comm'rs of Mobile County,* 827 F.2d 684, 689 (11th Cir.1987) (noting that *Lemon* test applies to Establishment Clause cases in public school setting).

To note that there are limits on the applicability of the *Marsh* analysis does not indicate, however, that the analysis is irrelevant to Establishment Clause cases. The principles announced in *Marsh* have been employed in recent decisions by the Sixth and Seventh Circuit Courts of Appeals. In *Van Zandt v. Thompson,* 839 F.2d 1215 (7th Cir.1988), the court found that *Marsh* controlled an Establishment Clause challenge to a House Resolution providing for a prayer room in the Illinois State Capitol. In so holding, the court rejected as "much too crabbed" the district court's view that *Marsh* was "'a decision wedded to the unique historical circumstances' of that case—a one-time departure from the Court's consistent application of the *Lemon* criteria to establishment clause cases." *Id.* at 1219.

In *Stein v. Plainwell Community Schools,* 822 F.2d 1406 (6th Cir.1987), the Court applied *Marsh* to determine the constitutionality of invocations and benedictions at high school graduation ceremonies. The court read *Marsh* as upholding practices such as invocations and benedictions that are religious in origin, but have become essentially secularized over the course of this country's history. Thus the court held that neutral or "civil" invocations and benedictions would be constitutionally permissible at a high school graduation ceremony, *id.* at 1409, but found that the invocations and benedictions delivered in that case were not sufficiently neutral. *Id.* at 1410. Although I tend to concur in the analysis and conclusion of Judge Wellford's dissent, it is interesting to note the language of the court in *Stein,* which applied *Marsh* in spite of the fact that the challenged practice occurred in a school-

sponsored event, and distinguished the school prayer cases in the following manner:

> [U]nlike classroom prayer, ceremonial invocations and benedictions present less opportunity for religious indoctrination or peer pressure.... Although children are obviously attending the ceremony, the public nature of the proceeding and the usual presence of parents act as a buffer against religious coercion. In addition, the graduation context does not implicate the special nature of the teacher-student relationship—a relationship that focuses on the transmission of knowledge and values by an authority figure. Therefore, the prayer in question here should be analyzed under the *Marsh* standards for ceremonial prayer notwithstanding the fact that a school function is involved.

*Id.* at 1409–10.

While it is not a "perfect fit," I believe that the case is more like *Marsh* than the school prayer cases such as *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) and *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). Accordingly, I would analyze the validity of the high school football game invocations under the principles enunciated in *Marsh*, rather than under those enunciated in *Lemon*.

In *Marsh*, the Supreme Court found that the Framers of the Constitution "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's 'official seal of approval on one religious view,'" but rather viewed "invocations as 'conduct whose ... effect ... harmonize[d] with the tenets of some or all religions.'" *Marsh*, 463 U.S. at 792, 103 S.Ct. at 3336 (citing *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113–14, 6 L.Ed.2d 393 (1961)). Noting also that there was no significant potential for indoctrination in the legislative setting, the Court concluded that the "practice of prayer similar to that now challenged.... presents no more potential for establishment than the provision of school transpor-

tation, beneficial grants for higher education, or tax exemptions for religious organizations." *Marsh*, 463 U.S. at 791, 103 S.Ct. at 3335–3336 (citations omitted).

The ceremonial invocations that open public high school games in Douglas County are facially constitutional under *Marsh*. These invocations add solemnity and dignity to a public event, preserve a long-standing and widespread tradition and remind participants and spectators of the importance of high ideals and values, such as sportsmanship and fair play at an athletic event. While the invocations at the football games may take the form of prayer, both the short duration of the invocations and the context in which they are delivered seem to alleviate any risk that the invocations will be used to proselytize or convert. Under the school's revised plan, where volunteer speakers are chosen at random from students, faculty and parents without regard to their religious or lack of religious beliefs and where there is no participation of or identification with ministers or their churches, the neutrality of the invocations can be presumed. The invocations here appear to be no more an endorsement of Protestant Christianity or of religion than the legislative prayer upheld in *Marsh*.

The indoctrination concerns raised in classroom prayer cases such as *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), are not implicated here. Football games in Douglas County are community events, and according to the district court's findings, the audience at the games consists of a large proportion of adults. Most students who attend the games are sixteen to eighteen years old and younger students are often accompanied by their parents. The invocations do not occur in a classroom or instructional setting, involving the student-teacher relationship, but instead take place after school hours. Football, band and related activities are extracurricular, and attendance at the football games is entirely voluntary. The invocations are given only five times a year, so there is no danger of daily indoctrination as there is when structured prayer is a part of a classroom setting. It is not improper to recog-

nize that the attendees at these events reflect varying degrees of participation and non-participation in these exercises, and that complete disregard or lack of attention results in no adverse consequences to the individuals. I believe that the invocations attempt to provide a solemn opening to a public event without creating the potential for indoctrination, so under *Marsh,* the practice does not constitute the establishment of religion.

Even if this case is outside the scope of *Marsh,* working through the *Lemon* factors, in my judgment, leads to the same conclusion reached under the alternative analysis suggested by *Marsh.*

Under the first prong of the *Lemon* test, a challenged practice must have some legitimate secular purpose, but its purposes need not be exclusively secular. *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 1362–1363, 79 L.Ed.2d 604 (1984). Thus, in spite of the fact that the invocations delivered at football games in Douglas County are in essence short, public prayers, the practice may still be acceptable as long as the school's actual purpose in maintaining the tradition is not "to endorse or disapprove of religion." *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed. 29 (1985).

In *Karen B. v. Treen,* 653 F.2d 897 (5th Cir. Unit A Aug. 1981), *aff'd mem.,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982), the Court struck down a statute providing for prayer in the public schools. In finding that the statute had no secular purpose, the Court discussed the intrinsically religious nature of prayer. While that case might seem to stand for the principle that no practice inherently religious in character may pass muster under *Lemon's* first prong, a closer reading shows that the Court simply rejected the proffered secular purpose as a sham. *Id.* at 900–01. This interpretation of the case is consistent with Supreme Court decisional law. *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362 ("Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause.").

Invocations have been recognized to have secular purposes. These include "solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Id.* at 693, 104 S.Ct. at 1369 (O'Connor, J. concurring). *See Stein v. Plainwell Community Schools,* 822 F.2d 1406, 1409 (6th Cir.1987) (invocation and benediction at high school graduation serve "solemnizing" function); *Bogen v. Doty,* 598 F.2d 1110, 1113 (8th Cir.1979) (invocations at County Commission meetings "directed toward establishing a solemn atmosphere and serious tone for the board meetings"); *Colo v. Treasurer and Receiver General,* 378 Mass. 550, 559, 392 N.E.2d 1195, 1200 (1979) (secular purposes of invocations at legislative sessions are "the maintenance of long tradition and the continuation of a ritual which prompts legislators to reflect on the gravity and solemnity of their responsibilities and of the acts they are about to perform."); *Marsa v. Wernik,* 86 N.J. 232, 248, 430 A.2d 888, 896–97 (invocations at borough council meetings serve as a "call to conscience" and create "an atmosphere conducive to open exchanges, cooperative participation, and tolerant and conscientious deliberations of all those present...."), *cert. denied,* 454 U.S. 958, 102 S.Ct. 495, 70 L.Ed. 2d 373 (1981).

The district court found that the invocations at Douglas County High School football games serve the secular purposes of continuing a custom and tradition of longstanding, adding a tone of solemnity and dignity to the proceedings, and reminding the spectators and players of the importance of sportsmanship and fair play. These findings are not clearly erroneous and should not be disregarded by an appellate court. The existence of these legitimate secular purposes indicates that the school's actual purpose in continuing the invocations is *not* to endorse or disapprove of any religion. The first prong of the *Lemon* analysis is satisfied.

The inquiry next focuses on whether the practice of opening public high school football games with an invocation has the primary effect of either advancing or inhibit-

ing religion. Put another way, the "effect prong ... asks whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Smith v. Board of School Comm'rs of Mobile County*, 827 F.2d 684, 690 (11th Cir.1987) (citing *Wallace v. Jaffree*, 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 2489 n. 42, 86 L.Ed.2d 29 (1985)).

As I read the cases, this aspect of *Lemon* has become a question of degree. The Supreme Court has made it "abundantly clear ... that 'not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.'" *Lynch v. Donnelly*, 465 U.S. 668, 683, 104 S.Ct. 1355, 1364, 79 L.Ed.2d 604 (1984) (citing *Committee for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 771, 93 S.Ct. 2955, 2964–65, 37 L.Ed.2d 948 (1973)). Examples of practices cited as acceptable because of their insubstantial effect on religion include the printing of "In God We Trust" on coins, the reference to God in the Pledge of Allegiance, the exhibition of religious paintings in governmentally supported museums, tax exemptions for religious organizations and the use of the phrase "God save the United States and this honorable court" to open court sessions. *But cf. Hall v. Bradshaw*, 630 F.2d 1018, 1021 (4th Cir.1980) ("A prayer, because it is religious, does advance religion, and the limited nature of the encroachment does not free the state from the limitations of the Establishment Clause ... No *de minimis* exception is tolerable."), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981).

Invocations at Douglas County High School games are given five times per season, are sixty to ninety seconds in duration, and are not delivered by clergymen, but rather by volunteers who are chosen without regard to their religious beliefs or lack thereof. Given these facts, it cannot be said that such invocations advance religion in any significant way or convey a message of endorsement for a particular religious creed. *See Bogen v. Doty*, 598 F.2d 1110, 1114 (8th Cir.1979) ("[W]e suggest that es-

tablishing solemnity is the primary effect of all invocations at gatherings of persons with differing views on religion."); *Grossberg v. Deusebio*, 380 F.Supp. 285, 290 (E.D.Va.1974) ("[T]he Court is not convinced that the primary effect of the invocation will be either doctrinal dissemination or a manifestation of governmental affinity for religion. Such substance is rarely the result of high school graduation exercises.").

*Lemon*'s last prong reviews the degree of governmental entanglement with religion engendered by the challenged practice. Under the school's revised plan for invocations, the school has no contact with churches or clergymen and school officials do not control or monitor the content of the invocations. The district court found that the cost to broadcast the invocations over the course of a season amounted to $1.08. These facts reveal no danger of excessive entanglement resulting from the pre-game invocations.

The expenditure of $1.08 for the invocations raises another issue, however, that of the permissibility of the invocations under the Georgia Constitution. Article I, section 2, paragraph 7 of the Georgia Constitution provides: *"Separation of church and state*—No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, cult, or religious denomination or of any sectarian institution." I would hold that there is no violation of this provision here because, as noted above, I do not believe that the invocations do aid or advance any particular church, sect, cult or religious denomination. Moreover, plaintiffs' position that the clause is violated by even a *de minimis* expenditure is difficult to square with Georgia's practice of paying a salary to its legislative chaplain. *See Marsh*, 463 U.S. at 794 n. 18, 103 S.Ct. at 3337 n. 18 (noting that Georgia is among the states that provide compensation to its chaplains).

### Mootness of Challenge to Traditional Invocation Practice

I would deem moot the Jagers' challenge to the invocations given before adoption of

the equal access plan. The resolution of this issue turns on an analysis of *Hall v. Board of School Comm'rs of Conecuh County*, 656 F.2d 999 (5th Cir. Unit B Sept. 1981) and *Saladin v. City of Milledgeville*, 812 F.2d 687 (11th Cir.1987). In the former case, this Court held that an Establishment Clause challenge to a school policy allowing students to conduct morning devotionals over the school's public address system was not moot, even though the school had discontinued the practice when the filing of the lawsuit was imminent. The Court noted that jurisdiction abates because of mootness when there is no reasonable expectation that the alleged violations will recur and when intervening events have completely and irrevocably eradicated the effects of the alleged violations. In finding that these criteria were not met, the Court focused on the fact that defendants asserted the constitutionality of the challenged activity up to the day of trial, even though the activity was clearly unconstitutional under *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), and was so recognized by the school superintendent. *Hall*, 656 F.2d at 1000.

In *Saladin*, the Court was faced with an Establishment Clause challenge to the design of a city seal, featuring a winged figure holding a banner inscribed with the words "Liberty" and "Christianity." The Court held that the challenge to the display of the seal on the city's water tank, vehicles and uniforms was moot because the city had agreed to remove the seal everywhere except on city stationery and documents. The Court based its decision on the fact that the city was no longer displaying the seal in the challenged locations, had promised not to display the seal in the future and there was no "basis for believing that the City will break its word." *Saladin*, 812 F.2d at 693.

I believe that *Saladin* controls this case. The key factor here is that the school system has not simply abandoned its earlier practice of using local ministers to deliver invocations, it has actually replaced this practice with a plan to select invocation speakers randomly from a pool which ex-

cludes clergymen. With this revised plan in place, adopted by consensus among school officials, there is no reasonable expectation that the activity initially challenged in this case will recur. While it is true that the school defended the traditional practice even though it had abandoned it, this fact is not dispositive because, unlike in *Hall*, the practice here was not clearly unconstitutional. Thus, the school's defense of its traditional practice does not clearly show either a desire to reinstate the practice or a dogmatic belief in its validity. The issue was moot as a matter of fact, even though both parties litigated the request for a declaratory decree. The law is clear that a court may not render advisory opinions on moot issues even though requested to do so by both parties. *See, e.g., Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 7–8, 98 S.Ct. 1554, 1559–60, 56 L.Ed.2d 30 (1978) (parties cannot "by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy.'"); *Kremens v. Bartley*, 431 U.S. 119, 136, 97 S.Ct. 1709, 1719, 52 L.Ed.2d 184 (1977) (issues deemed moot even though "all parties earnestly seek a decision on the merits.").

### Attorney's Fees

The issue of mootness dovetails with the issue of plaintiffs' entitlement to attorney's fees as the prevailing party in this suit. Plaintiffs prevailed in this case only to the extent that the district court declared the school's traditional policy to be unconstitutional. Because I believe that this controversy was moot, I would not reach the issue of the constitutionality of the traditional practice under the standards discussed above. Thus, I would hold that it cannot be determined whether plaintiffs would remain the prevailing parties on appeal as far as their challenge to the traditional practice. Accordingly, I would reexamine plaintiffs' status as prevailing parties.

The caselaw of this Circuit allows a party to recover fees when remedial action by defendants effectively moots the controver-

sy subsequent to the filing of the suit. *Iranian Students Ass'n v. Sawyer,* 639 F.2d 1160, 1163 (5th Cir. Unit A March 1981). In order to recover fees in the situation where there is no formal judicial relief, plaintiffs must show that "their lawsuit is a substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior." *Robinson v. Kimbrough,* 652 F.2d 458, 466 (5th Cir.1981). It is not enough, however, to show that the defendants acted just because they had knowledge that litigation might occur.

On September 15, 1986, school officials announced the implementation of new procedures for pre-game invocations. Because plaintiffs' lawsuit was not filed until September 19, 1986, it is clear that the remedial action taken by the school was not precipitated by the plaintiffs' suit. While the change in procedures may well have been taken because of the concern about a lawsuit, this is not sufficient to entitle plaintiffs to attorney's fees. In fact, because of the firm position of plaintiffs in negotiations to accommodate their views, the school officials could have well expected suit in spite of their implementation of the new plan. I believe plaintiffs should not be considered prevailing parties in their challenge to the school's traditional plan for delivering invocations. I would vacate plaintiffs' fee award because, as the discussion above indicates, I believe that plaintiffs should not prevail in their challenge to the equal access plan.

### Conclusion

The caselaw developed under the Establishment Clause has grown very complex, and there seems to exist a case for and against each proposition furthered by any party. There is a common thread, however, running through the majority of cases decided under both *Marsh* and *Lemon:* a common-sense balancing of the danger of Government establishment of religion with the recognition that religious traditions are a part of our nation's fabric. While I have applied tests and analyzed cases to reach what I believe to be a principled result in this case, I have also attempted to approach the issues in this common-sense fashion. Both paths lead to the same conclusion: the opening of public high school football games with an invocation does not constitute Government establishment of religion.