United States Court of Appeals,

Eleventh Circuit.

No. 95-9595.

Brian Gillespie BOWN, Plaintiff-Appellant,

v.

GWINNETT COUNTY SCHOOL DISTRICT, Zell Miller, in his official capacity as Governor of the State of Georgia, Michael Bowers, in his official capacity as Attorney General of the State of Georgia, George G. Thompson, Defendants-Appellees.

May 6, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-CV-2224-FMH), Frank M. Hull, Judge.

Before ANDERSON and CARNES, Circuit Judges, and CUDAHY[*], Senior Circuit Judge.

ANDERSON, Circuit Judge:

The only issue before us in this appeal involves a challenge to Georgia's Moment of Quiet Reflection in Schools Act ("the Act"). O.C.G.A. § 20-2-1050 (1996). Appellant Brian Gillespie Bown filed this suit seeking a declaratory judgment that the Act violates the Establishment Clause of the First Amendment and requesting that the Act's enforcement be enjoined. On a stipulated record, the district court made findings of fact and conclusions of law and entered final judgment for the appellees, holding that the Act does not violate the Establishment Clause. We affirm.

I. FACTS

A. *The Act and its Legislative History*

The Moment of Quiet Reflection in Schools Act became effective on July 1, 1994. The Act amended the former version of § 20-2-

---

[*]Honorable Richard D. Cudahy, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1050, which had allowed teachers to conduct a brief period of "silent prayer or meditation" at the beginning of each school day. The 1994 Act, as codified, provides as follows:

> 20-2-1050. Brief period of quiet reflection authorized; nature of period.
>
> (a) In each public school classroom, the teacher in charge shall, at the opening of school upon every school day, conduct a brief period of quiet reflection for not more than 60 seconds with the participation of all the pupils therein assembled.
>
> (b) The moment of quiet reflection authorized by subsection (a) of this Code section is not intended to be and shall not be conducted as a religious service or exercise but shall be considered as an opportunity for a moment of silent reflection on the anticipated activities of the day.
>
> (c) The provisions of subsections (a) and (b) of this Code section shall not prevent student initiated voluntary school prayers at schools or school related events which are nonsectarian and nonproselytizing in nature.

O.C.G.A. § 20-2-1050 (1996). The Act's uncodified preamble states:

> The General Assembly finds that in today's hectic society, all too few of our citizens are able to experience even a moment of quiet reflection before plunging headlong into the day's activities. Our young citizens are particularly affected by this absence of an opportunity for a moment of quiet reflection. The General Assembly finds that our young, and society as a whole, would be well served if students were afforded a moment of quiet reflection at the beginning of each day in the public schools.

Moment of Quiet Reflection in Schools Act, Act No. 770, § 1, 1994 Ga. Laws 256, 256 (1994). The Act also contains an uncodified severability provision which provides: "If any portion of this bill is found to be unconstitutional, it shall be stricken and the remaining portions of this bill shall remain in full force and effect as if the stricken portion had not been enacted." *Id.,* § 4, 1994 Ga. Laws at 257.

Senator David Scott, the primary sponsor of the Act,

introduced the Act as Senate Bill 396 in January 1994. Senator Scott represented an urban district in Atlanta, Georgia. He was the Chairman of the Senate Education Committee, Chairman of the Youth, Aging and Human Ecology Committee, and a member of the State Violence Task Force Committee to prevent violence in schools. Senator Scott introduced Senate Bill 396 as a part of a package of legislation aimed at reducing violence among Georgia's youths. [1] Senator Scott had observed that after several killings on school campuses, students came together to have a moment of silent reflection. Noting that this moment of silence seemed to be beneficial and calming, Senator Scott believed that providing students with an opportunity for silent introspection at the beginning of each school day would help to combat violence among Georgia's students. As a result, he introduced Senate Bill 396 as a part of his overall strategy for curbing juvenile violence.

After Senate Bill 396 passed in the Senate, the Georgia House of Representatives considered it and approved it with two amendments: the Johnson amendment and the Davis amendment. The Johnson amendment extended the period of silence from 60 to 120 seconds. The Davis amendment contained the present Act's subsection (c) and a subsection (d) stating that religious clubs shall not be prevented from meeting or recruiting members on school property as long as other student groups are given equal access.

Senate Bill 396 then went to a conference committee with House

---

[1] Senator Scott's legislative package included two other bills. One bill required parents of students with chronic disciplinary problems to participate in school disciplinary programs. The other bill made the sale or transfer of firearms to juveniles a felony. Neither of these two bills became law.

and Senate members.  The Conference Committee deleted the Johnson and Davis amendments and reported out the version of Senate Bill 396 originally approved by the Senate.  The Senate adopted the Conference Committee report, but the House rejected it.

A second conference committee was appointed.  This conference committee proposed the version of the bill originally approved by the Senate, together with subsection (c) of the Davis amendment and a severability provision.  Both the Senate and the House passed this version of the bill, and it became law.

The Georgia General Assembly does not officially record or transcribe its proceedings, and it does not issue official committee reports.  However, Bown submitted to the district court a certified transcript of the House proceedings during which the House debated and approved the Johnson and Davis amendments.  This transcript reveals that some House members wanted to institute school prayer and apparently believed that Senate Bill 396 would accomplish this goal.  A couple of House members opposed Senate Bill 396 because they believed it instituted school prayer. Several House members spoke in favor of Senate Bill 396 and stated that they did not believe the bill authorized school prayer or had a religious purpose.

B. *The Act's Implementation by the Gwinnett County School District*

Prior to the beginning of the 1994-95 school year, Bown, who was a South Gwinnett High School teacher, expressed reservations regarding the implementation of the Act. In a letter dated July 25, 1994, to Gwinnett County School Superintendent George Thompson, Bown stated that he "resent[ed] the General Assembly's intrusion on

the operation of [his] classroom" and requested guidance regarding the implementation of the Act in his classroom. Specifically, Bown was concerned about the interpretation and enforcement of subsection (c) and its interaction with subsections (a) and (b). Bown also stated that he was uncertain what his responsibilities would be if students engaged in audible prayer during the moment of quiet reflection. Bown concluded the letter by stating that he was concerned that he might face legal liability for enforcing the Act or for attempting to determine what is and is not appropriate prayer during the moment of quiet reflection.

In a letter dated August 12, 1994, Mr. Steve Spellman, Administrative Assistant to the Gwinnett County School Board and Superintendent, responded to Bown's letter by mailing Bown a copy of an Administrative Bulletin that Spellman had sent to all school principals in July 1994. The Administrative Bulletin instructed that:

> It is important that we recommend that teachers and administrators do not suggest or imply that students should or should not use [the moment of quiet reflection] for prayer. If a student asks, a teacher should advise a student that if the student desires to have a quiet prayer, he or she may do so. The statute specifically says "moment of quiet reflection." This clearly precludes students using the moment of quiet reflection to pray audibly, singly or in unison. We should not allow or tolerate any coercion or overbearing by some students to force others to pray. Nevertheless, we should be tolerant of non-disruptive, non-sectarian, non-proselytizing, student initiated prayer so long as it does not occur during the moment of quiet reflection; otherwise, it will not be a moment of *quiet* reflection. This time is not intended to be and shall not be conducted as a religious service or exercise, but considered as an opportunity for a moment of silent reflection on the anticipated activities of the day.

Following his receipt of Spellman's letter, Bown again attempted to raise his concerns regarding the Act in an August 16,

1994, faculty meeting and in a subsequent meeting with Principal Delores Hendrix. Partially in response to Bown's concerns, Superintendent Thompson and Principal Hendrix decided that Hendrix should announce the moment of quiet reflection at the beginning of each school day over the school intercom system in order to ensure that the announcement was handled in a uniform way every day.

At the beginning of the school day on August 22, 1994, the first day of the 1994-95 school year, Principal Hendrix made the following announcement over South Gwinnett High School's intercom system: "As we begin another day, let us take a few moments to reflect quietly on our day, our activities, and what we hope to accomplish." After Hendrix finished making this announcement, Bown told his high school class, "You may do as you wish. That's your option. But I'm going to continue with my lesson." Bown continued teaching his lesson during the moment of quiet reflection. Two students placed Bibles on their desks, and one of these students bowed her head. No students attempted to pray audibly or to lead others in prayer during the moment of quiet reflection or at any other time during the school day.

Later that day, Bown met with Superintendent Thompson and Principal Hendrix. Superintendent Thompson instructed Bown to comply with the moment of quiet reflection by remaining silent for the specified sixty seconds and gave Bown overnight to reconsider his actions. The next day, Bown informed Hendrix that he did not feel he could obey the Act and he left the school's campus. Bown was suspended from his job. The Board of Education subsequently terminated his employment with the Gwinnett County School District.

II. ANALYSIS

Bown argues that the Act violates the Establishment Clause of the First Amendment.[2] In analyzing this Establishment Clause challenge, we use the three part test articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See Lamb's Chapel v. Center Moriches Sch. Dist.,* 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 2148 n .7, 124 L.Ed.2d 352, 363 n. 7 (1993) (noting that despite heavy criticism of the *Lemon* test, *Lemon* has not been overruled). *See also Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 828-29 (11th Cir.), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989) (discussing appropriateness of using *Lemon* test). Under the *Lemon* test, "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster "an excessive government entanglement with religion.' " *Lemon,* 403 U.S. at 612-13, 91 S.Ct. at 2111 (citations omitted). In order to withstand an Establishment Clause challenge, a statute must satisfy all three prongs of the *Lemon* test. *Stone v. Graham,* 449 U.S. 39, 40-41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980) (per curiam).

A. *Secular Purpose*

1. *Determination of Purpose*

The first prong of the *Lemon* test requires that the

---

[2]The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion.... " U.S. Const. amend. I. The Establishment Clause, as incorporated by the Fourteenth Amendment, applies to the states. *Everson v. Bd. of Educ. of Ewing,* 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947).

challenged statute have a "clearly secular purpose." *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985). However, the statute's purpose need not be exclusively secular. *Lynch v. Donnelly,* 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 1363 n. 6, 79 L.Ed.2d 604 (1984). A statute violates the Establishment Clause if it is "entirely motivated by a purpose to advance religion." *Jaffree,* 472 U.S. at 56, 105 S.Ct. at 2489. *See also Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1527 (11th Cir.1993), *cert. denied,* 513 U.S. 807, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994) (" "[N]o legislative recitation of a supposed secular purpose can blind us' to an enactment's "pre-eminent purpose.' " (quoting *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) (per curiam))). In determining a statute's purpose, the court should inquire into " "whether [the] government's actual purpose is to endorse or disapprove of religion.' " *Jaffree,* 472 U.S. at 56, 105 S.Ct. at 2489 (quoting *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)). *See also County of Allegheny v. ACLU,* 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989); *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987); *Jager,* 862 F.2d at 829. A court usually should be deferential to the state's articulation of a secular purpose, but the secular purpose must be sincere and not a sham. *Edwards,* 482 U.S. at 586-87, 107 S.Ct. at 2579.

To ascertain a statute's purpose, it is, of course, necessary to examine the language of the statute on its face. *Edwards,* 482 U.S. at 594, 107 S.Ct. at 2583; *Church of Scientology,* 2 F.3d at

1527.  It is also appropriate to consider the legislative history of the statute and the specific sequence of events leading up to the adoption of the statute.  *Edwards,* 482 U.S. at 594-95, 107 S.Ct. at 2583; *Church of Scientology,* 2 F.3d at 1527.

## 2. *The Act's Purpose*

The Act's preamble sets forth a clearly secular purpose for the Act. The preamble indicates that the Georgia General Assembly felt that in "today's hectic society" there are few opportunities to engage in what the General Assembly felt would be beneficial quiet reflection.  The preamble explains that the purpose of the Act is to provide students with an opportunity for a brief period of quiet reflection before beginning the day's activities.

The secular purpose explained in the preamble is repeated expressly in the language of the statute itself.  Subsection (a) provides for a "brief period of quiet reflection."[3] O.C.G.A. § 20-2-1050(a) (1996).  Subsection (b) further reveals that the Act's purpose is secular by explaining that the "moment of quiet reflection ... is not intended to be and shall not be conducted as a religious service or exercise but shall be considered as an opportunity for a moment of silent reflection on the anticipated activities of the day."  O.C.G.A. § 20-2-1050(b) (1996).  Thus,

---

[3]This Act amended the former version of § 20-2-1050, which provided for a moment of "silent prayer or meditation."  The deletion of the words "prayer or meditation" and the substitution of the words "period of quiet reflection" provides some support for the idea that the Act's purpose is secular and is not to establish a moment of prayer. *Cf. Jaffree,* 472 U.S. at 58-60, 105 S.Ct. at 2490-91 (where Alabama already had a moment of silence statute, the fact that the new statute established a period of silence "for meditation or voluntary prayer" conveyed a message of endorsement and promotion of prayer).

subsection (b) expressly articulates a clear secular purpose and also expressly disclaims a religious purpose. By stating that the moment of quiet reflection shall not be conducted as a religious service or exercise, the statute indicates that Georgia is not advocating the moment of quiet reflection as a time for religious activity.[4] Subsection (b) even provides a secular topic on which students may reflect: "the anticipated activities of the day." *Id.*

Bown contends, however, that subsection (c) impermissibly infuses the Act with an improper religious purpose. Bown argues that subsection (c) authorizes voluntary, nonsectarian, nonproselytizing, student initiated prayer and thus shows that the Act has a religious purpose. However, an examination of the language of subsection (c) and its legislative history reveals that the most reasonable interpretation of subsection (c) is that it does not affirmatively authorize any activity at all, but rather merely rebuts any possible negative pregnant implied from the prohibition of religious activity in subsection (b). The explicit language of subsection (c) merely states that subsections (a) and (b) do not *prevent* certain activity which the legislature apparently believed was constitutional.[5] This interpretation is

---

[4]On the other hand, nothing in the statute prevents individual prayer or religious meditation during the moment of quiet reflection so long as such activity is silent.

[5]As discussed in the text below, the lawmakers apparently feared that the express prohibition in (b)—i.e., that the moment of quiet reflection not be conducted in a religious manner—might be misconstrued by some school officials as also preventing constitutionally permissible religious activities at other school events. The apparent intent of subsection (c) is to prevent any such unintended reading of subsection (b).

clear from the plain language of subsection (c):

> The provisions of *subsections (a) and (b)* of this Code section
> *shall not prevent* student initiated voluntary school prayers
> at schools or school related events which are nonsectarian and
> nonproselytizing in nature.

O.C.G.A. § 20-2-1050(c) (1996) (emphasis added). No affirmative
activity is authorized. Thus, subsection (c) merely clarifies that
subsections (a) and (b) shall not prevent other activity that is
constitutionally permissible under the First Amendment.[6]

Several considerations lead us to reject Bown's argument that
subsection (c) affirmatively authorizes religious activity at
schools and school-related events. As noted above, the plain
language of (c) indicates that it affirmatively authorizes nothing
and is merely intended to guard against unintended interpretations
of subsections (a) and (b). The overall structure of the Act
further supports this view. The preamble clearly explains that the

---

[6]Subsection (c)'s language is distinguishable from that of
the Mississippi statute at issue in *Ingebretsen v. Jackson Pub.
Sch. Dist.,* 88 F.3d 274 (5th Cir.), *cert. denied sub nom. Moore
v. Ingebretsen,* --- U.S. ----, 117 S.Ct. 388, 136 L.Ed.2d 304
(1996). The Mississippi statute provided that voluntary, student
initiated prayers that are nonsectarian and nonproselytizing
"shall be permitted" at school events. *Id.* at 277. The
Mississippi statute thus affirmatively authorized this type of
student prayer. In contrast, subsection (c) of the Act states
that nothing in subsections (a) and (b) "shall prevent" activity
the legislators believed to be constitutional. Subsection (c)
thus merely makes it clear that subsections (a) and (b) do not
prevent any activity that is protected by the First Amendment.

> We express no opinion in this case regarding whether a
> statute which provides that voluntary, student initiated
> prayers that are nonsectarian and nonproselytizing "shall be
> permitted" at school events would violate the Establishment
> Clause. *See Chandler v. James,* No. 96-D-169-N [--- F.Supp.
> ----] (M.D.Ala. Mar.12, 1997) (finding that Alabama statute
> which provides that voluntary, student initiated,
> nonsectarian, nonproselytizing prayers "shall be permitted"
> at school is unconstitutional).

Act is focused on "a moment of quiet reflection" for secular purposes, not on the religious purpose suggested by Bown's interpretation. The secular moment of silence focus is also borne out by the title of the Act ("Moment of Quiet Reflection in Schools") and the caption for the Act as codified ("Brief period of quiet reflection authorized; nature of period."). Finally, the severability clause further supports our interpretation that subsection (c) merely is intended to clarify subsections (a) and (b) and does not infuse the Act with a religious purpose. The severability clause provides that if any section of the Act is found to be unconstitutional, the other sections of the Act will remain in effect. Because of this severability clause, if subsection (c) were struck down, subsections (a) and (b) would remain and the moment of quiet reflection would continue. The severability clause thus indicates that the Georgia legislators, regardless of the validity of subsection (c), wanted to provide for a moment of quiet reflection for Georgia's students and would be satisfied to have subsections (a) and (b) enforced even in the absence of subsection (c).

The Act's legislative history, although somewhat conflicting, is not inconsistent with the express statutory language articulating a clear secular purpose and disclaiming a religious purpose. The Act's primary sponsor, Senator Scott, stated that he introduced Senate Bill 396 as one way of addressing the problems of violence which Georgia's children face. He viewed the Act not as providing for school prayer, but rather as providing for a moment for students to collect their thoughts, focus on the upcoming day,

and begin to develop self-respect and discipline. In the House debate, it is true that several representatives indicated a desire to reinstitute school prayer, and at least some apparently believed that the bill as amended in the House would do so. However, several legislators who supported the bill in the House indicated that they did not believe that the bill had anything to do with prayer.

Bown argues that the House debate with respect to subsection (c)[7] indicates a legislative purpose to restore prayer to the schools. As noted above, several representatives apparently believed that the amendment which ultimately survived as subsection (c) was a step toward returning prayer to schools. However, as also noted above, other legislators thought otherwise. There is also strong evidence indicating that subsection (c) was motivated by a Fifth Circuit decision which allowed voluntary, student-initiated prayers at high school graduations if the prayers were nonsectarian and nonproselytizing. *See Jones v. Clear Creek Indep. School Dist.,* 977 F.2d 963 (5th Cir.1992), *cert. denied,* 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993). It is apparent that the legislators supporting the addition of subsection (c) were concerned that subsections (a) and (b) might be construed to prohibit activities (like those in *Jones* ) that the legislators believed to be constitutionally permissible. In other words, these legislators viewed subsection (c) merely as making it clear that

---

[7]Subsection (c) was the only portion of the Davis Amendment which survived the Conference Committee and subsequent legislative proceedings to become part of the final version of the statute.

subsections (a) and (b) do not prevent constitutionally permissible activity.[8]

We are thus faced with legislative history that is much different from that in *Jaffree*. In *Jaffree,* the primary sponsor of the Alabama statute and the Governor of Alabama both explicitly conceded that the purpose of the Alabama statute was to return prayer to the Alabama schools, and Alabama failed to present any evidence of a secular purpose. *Jaffree,* 472 U.S. at 57 & n. 44, 105 S.Ct. at 2490 & n. 44. In contrast, in this case, the primary sponsor of the Act indicated that the Act had a secular purpose. It is true, as Bown argues, that some legislators expressed the desire to return prayer to Georgia's schools and supported the Act for this reason. However, it is also true that other legislators felt that the Act did not involve school prayer. Furthermore, there is no evidence as to what the many other legislators who voted in favor of the Act believed the purpose of the Act was or why they voted for the Act. The plurality in *Board of Education of Westside Community Schools v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), provides helpful guidance for a case such as this one in which the legislative history is conflicting. The *Mergens* plurality noted that "[e]ven if some legislators were motivated by a conviction that religious speech in particular was

---

[8]The issue of whether the type of student initiated, nonsectarian, nonproselytizing, voluntary school prayer permitted at high school graduations in *Jones* is constitutional is not raised by the facts of this case. Thus, we need not address that issue, nor whether there is tension between the Fifth Circuit decision in *Jones* and this circuit's decision in *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824 (11th Cir.), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989).

valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law." *Mergens,* 496 U.S. at 249, 110 S.Ct. at 2371 (plurality). Although some Georgia legislators expressed religious motives for voting for the Act, the fact remains that the language of the statute as enacted reveals a clearly secular legislative purpose: to provide students with a moment of quiet reflection to think about the upcoming day.

An overall assessment of the legislative history may well support a clear secular purpose, as the district court found. We need not so decide, however, because we readily conclude at the very least that the legislative history cannot be construed to override the express statutory language articulating a clear secular purpose and also disclaiming a religious purpose.

For the foregoing reasons, we conclude that the Act has a clearly secular purpose. Because the Act's clearly secular purpose is sincere and not a sham,[9] we conclude that the Act satisfies the first prong of the *Lemon* test.

B. *Primary Effect*

Under the second prong of the *Lemon* test, a statute violates the Establishment Clause if its primary effect is to advance or

---

[9]This case is not like *Edwards v. Aguillard,* for example, in which the Louisiana Legislature's supposedly secular purpose for enacting the Louisiana creationism statute was found to be a sham. In *Edwards,* the primary sponsor of the Louisiana statute introduced the statute for a religious purpose and the statute's supposedly secular purpose of promoting academic freedom was completely undermined by the statute's narrowing of the science curriculum. *Edwards,* 482 U.S. at 586-93, 107 S.Ct. at 2579-84.

inhibit religion. The effects prong of the *Lemon* test " "asks whether, irrespective of [the] government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval' " of religion. *Jaffree,* 472 U.S. at 56 n. 42, 105 S.Ct. at 2489 n. 42 (quoting *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)). *See also Jager,* 862 F.2d at 831.

The facts presented in this case demonstrate that the Act, as implemented by the Gwinnett County School District, does not have the primary effect of either advancing or inhibiting religion. The announcement made over the school intercom by Principal Hendrix indicated only that there would be a moment of silence to reflect on the day's activities. This announcement in no way suggested that students should or should not pray silently during the moment of quiet reflection. The Administrative Bulletin circulated to all school principals instructed that teachers should not suggest that students use the moment of quiet reflection for prayer. The Administrative Bulletin advises that if students ask if they can pray during the moment of quiet reflection, the teacher should tell the students that they may pray silently if they wish. There is no indication in this case that any teacher encouraged prayer in violation of the guidelines stated in the Administrative Bulletin. There is no evidence in this case that any students were exhorted to pray, favored for praying, or disfavored for not praying. *Cf. Jaffree,* 472 U.S. at 78, 105 S.Ct. at 2498 (O'Connor, J., concurring) (suggesting Establishment Clause problems arise if teachers exhort students to pray or favor students who pray). The record in this case indicates only that two of Bown's students

placed Bibles on their desks during the moment of quiet reflection, and one of these students bowed her head.

Bown contends, however, that the Act, by mandating a moment of silence, both advances and inhibits religion by favoring silent prayer and discouraging other forms of prayer. We are unpersuaded by this argument. It is true that students may not engage in audible prayer under the terms of the Act because audible prayer necessarily would not be silent. However, this conclusion does not cause the Act to run afoul of the second prong of the *Lemon* test. The Act mandates a moment of *quiet reflection,* not a moment of silent prayer. Students with religious beliefs which require non-silent prayer need not engage in silent prayer during the moment of quiet reflection. These students may sit silently, reflecting on whatever topic they choose, without compromising their religious beliefs or being forced to listen to other students' prayers. *See Jaffree,* 472 U.S. at 72, 105 S.Ct. at 2498 (O'Connor, J., concurring). Similarly, students who do not believe in prayer or religion at all may sit silently and think about any topic of their choice without being forced to pray or to listen to others' prayers. For that matter, students who do believe in silent prayer as a form of religious activity may pray silently, but are not forced to pray or to listen to others' prayers. All students may use the moment of quiet reflection as they wish, so long as they remain silent. [10] To the extent that individual

---

[10]As the court noted in *Gaines v. Anderson,* "If a student's beliefs preclude prayer in the setting of a minute of silence in a schoolroom, he may turn his mind silently toward a secular topic, or simply remain silent, without violating the statute or guidelines or facing the scorn or reproach of his classmates."

students decide to use the moment of quiet reflection as an opportunity to pray silently (as opposed, for example, to using the moment of quiet reflection to think about the day's activities, the secular topic suggested in the statute), the statute does not have the primary effect of either advancing or inhibiting religion so long as the moment of quiet reflection exercise is conducted in the manner prescribed by the statute (i.e., that the moment of quiet reflection is silent and is not conducted as a religious exercise).

We also note that this case does not involve impermissible government coercion of students to engage in religious activity. *See Lee v. Weisman,* 505 U.S. 577, 591-95, 112 S.Ct. 2649, 2658-59, 120 L.Ed.2d 467 (1992) (discussing the dangers of government coercion inherent in school religious activities).[11] The facts in this case do not indicate that the state has created a situation in which students are faced with public pressure or peer pressure to participate in religious activity. *Cf. Weisman,* 505 U.S. at 591-

---

421 F.Supp. 337, 345 (D.Mass.1976) (three judge district court) (discussing Free Exercise Clause).

[11]It is not entirely clear how the coercion inquiry interacts with the *Lemon* test. However, an examination of coercion seems to involve an analysis of the effects of a particular statute, so we include our discussion of coercion in our examination of the Act's effects. We note that some Justices have indicated that a showing of coercion is sufficient to prove an Establishment Clause violation, but is not necessary to establish such a violation. *See Weisman,* 505 U.S. at 604, 112 S.Ct. at 2664 (Blackmun, J., concurring) ("Although our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient. Government [coercion] ... is an obvious indication that the government is endorsing or promoting religion."); *Weisman,* 505 U.S. at 619, 112 S.Ct. at 2672 (Souter, J., concurring) ("Our precedents .... simply cannot, however, support the position that a showing of coercion is necessary to a successful Establishment Clause claim.").

93, 112 S.Ct. at 2658 (explaining that school sponsored prayers at a high school graduation create public pressure and peer pressure to at least maintain respectful silence during the prayers). The Act explicitly says that the moment of quiet reflection is not to be conducted as a religious exercise. O.C.G.A. § 20-2-1050(b) (1996). All that students must do under the Act is remain silent for 60 seconds; they are not encouraged to pray or forced to remain silent while listening to others' prayers. As a result, we conclude that this case reveals no coercion.[12]

For the foregoing reasons, we conclude that there has been no violation of the second prong of the *Lemon* test.

C. *Excessive Entanglement*

The third prong of the *Lemon* test dictates that the statute must not foster an excessive government entanglement with religion. The *Lemon* test's excessive entanglement prong has been interpreted to mean that " "some governmental activity that does not have an impermissible religious effect may nevertheless be unconstitutional, if in order to avoid the religious effect [the] government must enter into an arrangement which requires it to monitor the activity.' " *Nartowicz v. Clayton County Sch. Dist.,* 736 F.2d 646, 649 (11th Cir.1984) (quoting *Americans United for Separation of Church and State v. School Dist. of the City of Grand Rapids,* 718 F.2d 1389, 1400 (6th Cir.1983)). We conclude that

_____

[12]We reject Bown's argument that there is evidence of coercion in this case. The fact that two students placed Bibles on their desks and one of them also bowed her head does not indicate coercion. Indeed, the fact that out of the entire class only two students did so indicates a lack of coercion. We express no opinion on a case in which there is substantial evidence of visible religious activity in the classroom.

there is no excessive entanglement in this case. All that the Act requires is that the students and the teacher in charge remain silent during the moment of quiet reflection. Teachers are not required to participate in or lead prayers, nor are they required to review the content of prayers during the moment of quiet reflection. *Cf. Jager,* 862 F.2d at 831 (suggesting that excessive entanglement might result if school officials monitored the content of pre-football game invocations or chose the invocation speakers); *Ingebretsen,* 88 F.3d at 279 (finding excessive entanglement when school administrators participated in and reviewed the content of prayers). The fact that a teacher must stop a student who prays audibly or otherwise makes noise during the moment of quiet reflection does not result in excessive government entanglement with religion. There are many times during any given school day when teachers tell their students to be quiet and when audible activity of any kind is not permitted. The fact that this particular period of silence is mandated statewide does not create entanglement problems.

Bown argues that subsection (c) affirmatively permits student initiated, voluntary school prayers so long as they are nonsectarian and nonproselytizing. He argues that teachers would have to monitor such prayers to ensure they were nonsectarian and nonproselytizing, and that this monitoring would constitute excessive entanglement. We can assume *arguendo* without deciding that such monitoring would constitute excessive entanglement. However, Bown's argument fails for two reasons. First, we have already rejected Bown's interpretation of subsection (c) and

concluded that the most reasonable interpretation is that subsection (c) affirmatively authorizes nothing at all. Rather, we think subsection (c) merely clarifies that the moment of quiet reflection statute does not prevent other activity that is constitutionally permissible. *See supra* Part II.A.2. Thus, the Act does not affirmatively authorize prayers which a teacher would have to monitor, and the monitoring problem about which Bown speculates simply does not arise under this Act.

Second, this case involves no prayer for a teacher to monitor. Indeed, no case involving the moment of quiet reflection would involve prayers for a teacher to monitor because any prayers during the moment of quiet reflection necessarily must be silent. Thus, the monitoring problem postulated by Bown is not present in this case and is not likely to arise in any moment of quiet reflection case.[13]

For the foregoing reasons, we conclude that the Act satisfies

---

[13]The Supreme Court has indicated that an Establishment Clause challenge may be made both facially and as applied. *Bowen v. Kendrick,* 487 U.S. 589, 600-02, 108 S.Ct. 2562, 2569-70, 101 L.Ed.2d 520 (1988). We readily conclude that the instant statute is not facially unconstitutional. As explained above, subsection (c) does not affirmatively authorize any activity at all. Rather, the focus of the Act is clearly upon the conduct of moments of quiet reflection in schools. The express provision of the Act—that the moment of quiet reflection is "not intended to be and shall not be conducted as a religious service or exercise but shall be considered as an opportunity for a moment of silent reflection on the anticipated activities of the day"—persuades us that most moment of quiet reflection exercises will be conducted in a constitutionally permissible manner, as was the exercise in the instant case. Thus, Bown's conclusory facial challenge is without merit. *See Bowen,* 487 U.S. at 610, 108 S.Ct. at 2575 (rejecting a facial challenge because, *inter alia,* "nothing on the face of the ... [statute] indicates that a significant proportion of the federal funds will be disbursed to "pervasively sectarian' institutions").

the third prong of the *Lemon* test.

## III. CONCLUSION

The Georgia Moment of Quiet Reflection in Schools Act satisfies all three prongs of the *Lemon* test. The Act has a clearly secular purpose. The specific facts presented in this case indicate that the Act does not have the primary effect of advancing or inhibiting religion and does not create an excessive government entanglement with religion. As a result, we hold that the Act does not violate the Establishment Clause. The district court's judgment for the appellees is affirmed.

AFFIRMED.