MARCUS, Circuit Judge,
dissenting:
The court today holds that the Duval County school system’s policy of permitting graduating students to vote on whether to select a student to deliver an unrestricted message at the opening or closing of a high school graduation ceremony violates the Establishment Clause of the First Amendment. The majority finds Duval County’s policy facially unconstitutional simply because the school sponsors the ceremony and provides the platform and opportunity for a student to deliver a message that may or may not have any religious content. In the process, the majority opinion has come perilously close to pronouncing an absolute rule that would *1257 excise all private religious expression from a public graduation ceremony, no matter how neutral the process of selecting the speaker may have been, nor how autonomous the speaker was in crafting his message. By somehow transforming a private speaker into a state actor and a student’s message into the state establishment of religion, the majority has, I believe, misapprehended the Supreme Court’s Establishment Clause jurisprudence, and has ignored the “crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.” Board of Educ. v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion). I, therefore, respectfully dissent.
I.
The central issue presented in this case is whether the Establishment Clause dictates that every form of religious expression be eliminated from graduation ceremonies, no matter who may express it. The majority recognizes, as it must, that the Supreme Court has never levied a per se ban on all religious expression at high school graduation ceremonies, and it appears to accept, at least in a general way, that in the public school context, Establishment Clause jurisprudence is of “necessity one of line-drawing,” Lee v. Weisman, 505 U.S. 577, 598, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), “sometimes quite fine, based on the particular facts of each case,” Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 847, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (O’Connor, J., concurring). Indeed, the majority opinion begins its discussion, as it must, with an examination of Lee v. Weisman, where the Court had occasion to visit for the first time the question of school prayer at a high school graduation ceremony. In Lee, Justice Kennedy, writing for the majority, took special care “to recognize that, at graduation time and throughout the course of the education process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the - public schools and their students.” Lee, 505 U.S. at 598-99, 112 S.Ct. 2649 (citing Board of Educ. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)); see also id. at 630 n. 8, 112 S.Ct. 2649 (Souter, J., concurring) (citing Witters v. Washington Dep’t of Servs. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986)).
Instead of purging graduation ceremonies of all prayer, Lee calls for the difficult task of separating a student’s private message, which may be religious in character, from the school board’s religious speech, protecting the former and prohibiting the latter. Close attention to the Duval County policy leads me to the conclusion that the policy is facially constitutional.
A.
The facts needed to measure the facial constitutionality of the School Board’s policy are straightforward, uncontroverted, and laid out fully by the district court in Adler v. Duval County School District, 851 F.Supp. 446 (M.D.Fla.1994) (“Adler I”), vacated as moot, 112 F.3d 1475 (11th Cir.1997) (“Adler II ”).[1] Invocations, benedic *1258 tions, and other religious prayers or messages were traditionally offered by clergy and others at public high school commencement ceremonies in the Duval County School District. In 1992, following the decision in Lee v. Weisman (holding that a Providence, Rhode Island school principal, acting in accord with school board policy, violated the Establishment Clause by inviting a local clergyman to deliver a nonsectarian prayer at graduation), the Duval County Superintendent, Larry Zenke, instructed Vicki R. Reynolds, the school district’s legal affairs officer, to research the issue further. Reynolds advised Superintendent Zenke that it would be permissible for principals to allow student-initiated and student-led prayer during graduation ceremonies if the school authorities were not involved in the decision-making process. See Adler I, 851 F.Supp. at 448.
On May 5, 1993, she issued a memorandum (“The Reynolds Memorandum”) to all high school principals, which remains the operative policy for student messages at graduation ceremonies in the Duval County School District. The Reynolds Memorandum provides in part:
You will recall that after the 1992 Supreme court case of Lee v. Wiseman [sic], you received a memorandum from me instructing that because of the decision, we would no longer be able to have prayers at graduation ceremonies. Most of you have recently been bombarded with information, as have I, regarding whether or not student initiated and led prayers are acceptable based upon a recent Fifth Circuit opinion. The purpose of this memorandum is to give you some guidelines on this issue if the graduating students at your school desire to have some type of brief opening and/or closing message by a student.
This area of the law is far from clear at this time, and we have been threatened by lawsuits from both sides on the issue depending on what action we take. The key to the Lee v. Wiseman [sic] decision was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative. With that premise in mind, the following guidelines may be of some assistance:
1. The use of a brief opening and/or closing message, not to exceed two inm-utes, at high school graduation exercises shall rest within the discretion of the graduating senior class;
2. The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;
3. If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board [sic], its officers or employees;
The purpose of these guidelines is to allow the students to direct their own *1259 graduation message without monitoring or review by school officials.
Id. at 449.
In 1993, under this policy, ten of seventeen high school graduation ceremonies had some form of student delivered religious message. At the other seven graduations, there were no student messages at all or the messages were entirely secular in character. See id. at 449-50. There is no tabulation in the record of comparable statistics for subsequent graduations.
B.
Lee v. Weisman presents the analytical framework against which to measure the Duval County policy, and resort to Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105 (1971), may be unnecessary. But whether measured against the Lee framework or Lemon, to my thinking, the policy passes facial constitutional muster. In Lee, Justice Kennedy wrote that “the controlling precedents as they relate to prayer and religious exercise in primary and secondary public schools compel the holding here that the policy of the City of Providence is an unconstitutional one. We can decide the case without reconsidering the general framework by which public schools’ efforts to accommodate religion are measured.” 505 U.S. at 586-87, 112 S.Ct. 2649. The conclusion that we should measure the policy at issue by comparing it to the Lee analysis is bolstered by the concurring opinions of Justices Blackmun and Souter and the dissent of Justice Scalia. Notably, none of the Justices employed the Lemon test in Lee.
Justice Blackmun, concurring in an opinion joined by Justices Stevens and O’Con-nor, formulated the applicable test in these terms: “[njearly half a century of review and refinement of Establishment Clause jurisprudence has distilled one clear understanding: Government may neither promote nor affiliate itself with any religious doctrine or organization, nor may it obtrude itself in the internal affairs of any religious institution.” Id. at 599, 112 S.Ct. 2649 (Blackmun, J., concurring). Justice Souter, also concurring in an opinion joined by Justices Stevens and O’Connor, likewise did not apply Lemon’s three-part test. For him the “principle against favoritism and endorsement has become the foundation of Establishment Clause jurisprudence, ensuring that religious belief is irrelevant to every citizen’s standing in the political community.” Id. at 627, 91 S.Ct. 2105 (Souter, J., concurring). Finally, dissenting, Justice Scalia, writing for himself, Chief Justice Rehnquist, and Justices White and Thomas, observed that the Court’s opinion had demonstrated the “irrelevance of Lemon by essentially ignoring it ... and the interment of that case may be the one happy byproduct of the Court’s otherwise lamentable decision.” Id. at 644, 91 S.Ct. 2105 (Scalia, J., dissenting).
In Lee, the Supreme Court pointed at two “dominant facts” as marking the boundaries of its decision: first, the Providence school officials ordained and directed the performance of a religious exercise by deciding to include prayer in the graduation ceremony, by selecting a clergyman to deliver the prayer, and by providing the clergyman with guidelines informing the content of the prayer; second, pressure was exerted on students to attend graduation and conform with their peers. See id. at 586-88, 112 S.Ct. 2649. What the Supreme Court found troubling about Lee was that the government clearly directed a formal religious exercise' — -albeit in the form of a nonsectarian prayer — under such circumstances as to oblige the participation of many who objected. As Justice Kennedy wrote:
These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require at *1260 tendance as a condition for receipt of the diploma.
Id. at 586, 112 S.Ct. 2649. There can be little doubt, then, that in Lee, the Providence, Rhode Island school system ordained and established a religious exercise at a graduation ceremony. The graduation prayer delivered by a rabbi was in every sense the state’s prayer.
In striking contrast, under the Duval County policy, however, neither the School Board nor its principals may ordain, establish or direct that a prayer or a message of any kind shall be delivered at graduation. Indeed, the Duval County policy explicitly divorces school officials from the decision-making process as to whether any message — religious or not — may be delivered at graduation. Moreover, under the policy, the School Board and its agents have no control over who will draft the message, if there be any message at all, or what its content may be. According to Duval County policy, school officials merely allow the graduating class to decide whether or not to have a speaker deliver a message at graduation, and, if so, it’s left to the student body to select that speaker. Indeed, the special concurrence concedes that the policy “sets forth secular criteria for se-Tecting speakers.” Special Concurrence at 1253 n. 4. The School Board does not suggest in any way, let alone require the graduating class to consider religious criteria or any other criteria in deciding whether or not to have a student speaker or in selecting the speaker. And most notably for me, if the graduating class chooses to have a message, the content of the message shall be prepared by the student speaker alone and no one else. The Duval County School Board is prohibited by the very terms of its policy from monitoring or otherwise reviewing the message in any way. On the face of the policy, the students unambiguously understand that any student message is utterly divorced from School Board sponsorship. In short, I cannot conceive of how a message delivered by a student under these circumstances can be characterized as the state’s message or how a policy allowing the delivery of an autonomous message can be seen as the state direction of prayer.
The Supreme Court struck down the policy in Lee precisely because Providence school officials directed the performance of a “formal religious exercise.” 505 U.S. at 586, 112 S.Ct. 2649. The Court did not suggest that school sponsorship of the graduation event, standing alone, was sufficient to find the Providence policy unconstitutional, or it would have banned all religious expression at graduation. The majority here contends that the control exerted by the school district over the graduation ceremonies affixes the imprimatur of the state on any religious message delivered by any student. While the majority opinion acknowledges that Lee is distinguishable from this case, it nevertheless concludes that the Duval County School Board policy fails to erase the imprint of the state from student messages at graduation ceremonies. Lee does not support this rationale for finding the School Board policy unconstitutional.
The majority’s holding which, in essence, requires schools to banish religion from all events in which there is school control, is far-reaching and goes further than the Establishment Clause requires. Following the majority’s reasoning, the religious content of any speech at a graduation ceremony is likely attributable to the school merely because the school sponsors the event. As a result, schools would have to prevent any speaker, including speakers as diverse as athletes, politicians, academics, entertainers, maybe even judges, from discussing a religious topic or invoking the Lord’s name, to ensure that no audience member perceives that the school is endorsing the speaker’s religious message. By that logic, those speakers would bear the imprimatur of the state simply because they were selected by the school to speak at an event over which the school has great control. But a graduation free of all religious expression is not required by the Establishment Clause. The Supreme Court has repeatedly held that neutrality, not hostility, toward religious expression is required *1261 by the Establishment Clause. Indeed in Lee the Court recognized that “[t]he First Amendment’s Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State.” 505 U.S. at 589, 112 S.Ct. 2649; see also Agostini v. Felton, 521 U.S. 203, 231, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (observing that there is no advancement of religion where “aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis”); Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 839, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (“A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion.”); Board of Educ. v. Grumet, 512 U.S. 687, 696, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (“‘A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of “neutrality” toward religion.’ ” (quoting Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 792-93, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973))); Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (“[W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.”). What the Establishment Clause bars is state sponsorship of religion or prayer in the context of public school graduation ceremonies.
How then, does the majority opinion, or the special concurrence, propose to convert a private speaker who is selected through a wholly neutral process, and who is given complete autonomy over the content of her speech, into a public, state sponsored speaker? Two basic arguments are offered. First, the majority contends that by providing the platform and opportunity, the state has created a sufficient link to the student speaker to convert the student’s private speech into public, state sponsored speech. Second, both the majority and the special concurrence suggest that the process of selecting the speaker shrouds the otherwise private speech with the imprint of the state. The first argument — that by providing the platform, the speech becomes public- — goes too far. The second — that the speaker somehow garners state authority by virtue of the plebiscite — has no logical rationale.
Even if we accept that the Duval County School Board exerted “overwhelming control” over the graduation ceremony, it is clear that it did not have control over the elements which are most crucial in this calculus: the selection of the messenger, the content of the message, or most basically, the decision whether or not there would be a message in the first place. On the face of the policy, the students alone decide both whether there will be a message, and, if so, who the messenger will be. By suggesting that the state has “directed” prayer, the special concurrence has misapprehended the School Board policy. Special Concurrence at 1252 n. 2. In essence, this case is indistinguishable from Doe v. Madison School District No. 321, 147 F.3d 832 (9th Cir.1998), withdrawn & reh’g en banc granted, 165 F.3d 1265 (9th Cir.1999), where the Ninth Circuit held that graduation speech does not bear the imprimatur of the state when the speaker is a student, not a cleric; the student speaker is selected on neutral and secular criteria; and the student has complete autonomy over content.[2] See id. at 835-37.
*1262 The majority insists that the delegation of responsibilities to nongovernmental actors does not altogether absolve the state of its constitutional duty. Stated at so high an order of abstraction, I can readily accept that premise. But the Duval County School Board in no way delegated any state authority to the students by providing them the opportunity to decide if they wanted a student message, and to select a student speaker if they so chose. The majority has in no way proven that the students’ private conduct has become so “entwined with government policies” and so “impregnated with governmental character” as to become subject to the constitutional limitations placed on state action. Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). In fact, the state’s only involvement in the message is to provide students with the opportunity to vote, and to impose a time limit of two minutes. Neither of these facts establishes that the state has so insinuated itself into the decision that it can transform private speech into an utterance of the state. Nevertheless, the majority opinion goes so far as to suggest that the student’s topical choice, which everyone concedes is made in a purely autonomous manner, is still attributable to the state, and says that this control cannot be erased through delegation of one portion of the ceremony. The majority opinion assumes what it cannot prove — that utterances made on a state platform are automatically transformed from private into public speech. It is beyond my imagination to *1263 say that everyone on the platform at a high school graduation ceremony, including a local politician or celebrity, is a state speaker merely because the state has provided the platform, onto which private individuals may be invited to share their privately held views. Such private speech does not become the state’s merely by being uttered at a state event on a state platform.[3]
The Duval County policy permits graduating students to decide through majority/plurality vote whether a student’ volunteer shall deliver a message. It does not direct what the message will be. The state here coerces nothing — it merely offers to students the opportunity to vote for or against a message, but does not compel the answer. The majority opinion takes a neutral process and an autonomous speaker and recasts it as an arm of state coercion, even though there is no preordained religious result.
Nevertheless, the majority and the special concurrence would proscribe a policy that on its face plainly allows a student to select her own message, fearful that on occasion that message may be a prayerful one. It is worth repeating, however, that while the state cannot advance religion, similarly, it cannot act in a hostile manner in the face of private religious speech pub-lieally uttered. See Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). If a per se rule is erected, that all speech on a platform is state speech, this rule would ran afoul of the Free Exercise and Free Speech clauses.[4] If the senior class were asked to vote whether to have a student deliver a poem, or perhaps sing a song, at a graduation exercise, that act is *1264 still the selection of a private speaker through neutral criteria. The Duval County policy creates the mechanism whereby the students could elect to have a message and select the speaker and nothing more.
The majority and the special concurrence reason that the policy’s delegation to students of the power to vote for a graduation speaker renders that speaker — by virtue of the vote — -a state actor. It is this leap of logic, taking the selected student representative and, without explanation, turning her into a state actor, which cannot be sustained. In his concurrence in Lee v. Weisman, Justice Souter said that:
If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of these speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State.
505 U.S. 577, 631, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring). In Adler, where the state has not even chosen the private speaker, we have even less than this. See also Doe v. Madison Sch. Dist. No. 321, 147 F.3d at 836 (“[W]hen a state uses a secular criterion for selecting graduation speakers and then permits the speaker to decide for herself what to say, the speech does not bear the imprimatur of the State.”)
The argument is now that the student messenger is a state actor because the democratic process of voting by public school students somehow converts the selected speaker into a public official. But this student is, at most, a representative of the student body, not an official of the state. She is in no way analogous, as the majority opinion suggests, to the School Board president who is, unlike the student, a publically-elected official. She has no power or authority or official capacity to inform, carry out, or guide state policy. It remains unconvincing to argue that the student becomes a state actor because she was chosen by her peers, unless each high school student individually is considered to be a state actor, or somehow the students, acting in concert, come to be vested with the power of the state.
I offer two examples. First, consider the case of the selection of a Homecoming Queen. While she may be selected by a vote, or plebiscite of the entire senior class, the Homecoming Queen cannot be characterized as a state actor, or a representative of the state, merely because she holds a “public” position and sits atop the Homecoming float. Imagine, second, the example of replacing the traditional valedictory address with the practice of affording the students of the graduating class the opportunity to select the graduation student speaker through a vote by the entire class. In this hypothetical, the student speaker is selected, not by the School Board on the basis of grades, but by the students on the basis of student choice — be it popularity, ability to entertain, achievement in athletics, or for some other reason. It strains reason to suggest that, by virtue of her selection by the majority of the senior high school class, the student speaker becomes a mouthpiece of the state. Both examples suggest that the senior class’ act of voting does not, in any way, turn the senior class vote into state action, nor turn the chosen student into a state actor. Because Duval County policy utilizes this same methodology, affording the students of the senior class, in a wholly secular way, the opportunity to vote whether or not to have a message and to select a student speaker, this vote is no more vested with the imprimatur of the state than are the votes for graduation class speaker or Homecoming Queen.
It is hard to understand how the principal, school board, or state has sponsored or directed the student speaker’s actions when all of the central decisions — who speaks, whether there will be a speaker, and what the content of the speech is — are uncontrolled by the state. Delegation of decision-making to pick a private speaker alone does not place the state’s imprint on graduation prayer. The delegation provided to the students — whether or not to have *1265 a student message — can in no way be seen as the delegation to a non-governmental actor of some aspect of a practice which tends to establish religion. Where the student is chosen in a neutral and secular way and where the student is allowed complete autonomy over the message, the majority’s position is untenable.
C.
The other dominant fact of Lee, whether Duval County students are coerced “to support or participate in religion or its exercise,” 505 U.S. at 587, 112 S.Ct. 2649, by the School Board policy, is largely determined by the measure of state control over the message at a graduation ceremony, rather than state control over the ceremony itself. I do not quarrel with the observations made in Lee, that students feel compelled to attend graduation, see id. at 595, 112 S.Ct. 2649, and that schools “retain a high degree of control” over graduation ceremonies, id. at 597, 112 S.Ct. 2649. But these conclusions do not suffice to decide the issue of coercion. The focus must be on whether the state has endorsed the message in an appreciable manner, which, when combined with the inherent nature of the graduation ceremony, induces students to participate in a religious exercise.
Schools may make private religious speech their own by endorsing it, but schools do not endorse all speech that they do not censor. See Board of Educ. v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion). We need not assume, as the majority does, that Duval County seniors will interpret the school’s failure to censor a student message for religious content as an endorsement of that message. As we have noted, the students clearly understand, by the very terms of the Duval County policy, that any student message is utterly divorced from any School Board sponsorship. While there may still be pressures on students to attend graduation and conform with their peers, the state’s control over a religious exercise, essential to Lee’s holding, see 505 U.S. at 590, 112 S.Ct. 2649 (“The degree of school involvement here made it clear that the graduation prayers bore the imprint of the state .... ”); id. at 597, 112 S.Ct. 2649 (“[T]he state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise .... ”), is absent here.
II.
While the majority opinion seems to acknowledge that the Duval County School Board policy should be measured against the framework of Lee — a view I wholly share — it also undertakes a brief analysis of the policy under Lemon v. Kurtman. Even if we assume that Lemon provides the appropriate analytical vehicle against which to measure the Duval County School Board policy, the policy still withstands facial constitutional challenge. Under the Lemon test, the policy must have a secular purpose, it may not have a primary effect that either advances or inhibits religion, and it must not foster an excessive government entanglement with religion. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105 (1971). I believe that the School Board policy, on its face, has a secular purpose and violates neither of Lemon’s proscriptions.
A.
The majority and the special concurrence can discern no secular purpose in the Duval County School Board policy, brushing aside without comment the purpose, explicitly stated in the policy, “to allow the students to direct their own graduation message without monitoring or review by school officials.” Likewise, it ignores the two secular purposes recognized by the district court: “to solemnize the occasion and to observe and protect the right of free speech” of the student speaker. Adler I, 851 F.Supp. at 453.
Since Lemon provides that a statute must have “a secular legislative purpose,” 403 U.S. at 612, 91 S.Ct. 2105 (emphasis *1266 added), a statute will only violate the Establishment Clause if it is “entirely motivated by a purpose to advance religion,” Wallace v. Jaffree, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); see also Bowen v. Kendrick, 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (a court “may invalidate a statute only if it is motivated wholly by an impermissible purpose”); Lynch v. Donnelly, 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (“The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations.”). A statute may satisfy Lemon’s first prong even if it is “motivated in part by a religious purpose.” Wallace, 472 U.S. at 56, 105 S.Ct. 2479.
Moreover, the Supreme Court has instructed us to be “deferential to a State’s articulation of a secular purpose,” Edwards v. Aguillard, 482 U.S. 578, 586, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), particularly where “a legislature expresses a plausible secular purpose” for a policy or action, Wallace, 472 U.S. at 74-75, 105 S.Ct. 2479 (O’Connor, J., concurring in the judgment). We respect that purpose unless it is insincere or a “sham,” Edwards, 482 U.S. at 586-87, 107 S.Ct. 2573; Bown v. Gwinnett County Sch. Dist., 112 F.3d 1464, 1468 (11th Cir.1997), or where the statute at issue has a “preeminent purpose” which is “plainly religious in nature,” Stone v. Graham, 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam); see also Edwards, 482 U.S. at 591, 107 S.Ct. 2573; Wallace, 472 U.S. at 56-60, 105 S.Ct. 2479. But the Supreme Court has been reluctant to attribute an unconstitutional motive where a “plausible” secular purpose may be discerned from the statute. Mueller v. Allen, 463 U.S. 388, 394-95 & n. 4, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983).
Additionally, “inquiry into legislative purpose begins with interpreting the law itself.” Church of Scientology v. City of Clearwater, 2 F.3d 1514, 1527 (11th Cir.1993). For the most part, statutes which the Supreme Court has invalidated for lack of secular purpose have openly favored religion or demonstrated a religious purpose on their face. See, e.g., Edwards, 482 U.S. at 593, 107 S.Ct. 2573 (invalidating a Louisiana law that required creationism to be discussed with evolution in public schools); Wallace, 472 U.S. at 57-58, 105 S.Ct. 2479 (overturning an Alabama statute that authorized a moment of silence because the state made no attempt to justify the statute in terms of any secular purpose); Stone, 449 U.S. at 41, 101 S.Ct. 192 (striking down a Kentucky statute requiring the posting of the Ten Commandments in public classrooms); Engel v. Vitale, 370 U.S. 421, 424, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (holding unconstitutional a New York law authorizing state-directed daily classroom prayer in public schools).
Three secular purposes are plainly encompassed by this policy. First, the Duval County policy, on its face, affords graduating students an opportunity to direct their own graduation ceremony by selecting a student speaker to express a message. I do not understand how this purpose of allowing students to share in the decision-making process concerning the shape of their own graduation is denuded of a legitimate secular purpose, simply because an autonomous student speaker chosen by neutral criteria may express a prayerful message. The majority presumably would admit a legitimate secular purpose if the School Board had decided to allow students of the graduating class to select the student graduation speaker through class vote rather than by class rank. Doing so allows the graduating high school seniors to share civic responsibility in shaping their ceremony. The Duval County School Board has done no more here.
Moreover, the School Board policy evinces another legitimate secular purpose in allowing students to solemnize the event as a seminal educational experience. See Chaudhuri v. Tennessee, 130 F.3d 232, 236 (6th Cir.1997); Tanford v. Brand, 104 F.3d 982, 986 (7th Cir.1997); Jones v. Clear *1267 Creek Indep. Sch. Dist., 977 F.2d 963, 966-67 (5th Cir.1992); cf. Lynch v. Donnelly, 465 U.S. 668, 693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring). This purpose is not vitiated of its secular character merely because the policy invites consideration of meaning and values in the context of a graduation ceremony. And it would be very damaging to public education if the Establishment Clause were to be seen as inhibiting any reflection by a student of transcendent meaning and value in life, whether grounded in religion or not.
Finally, the School Board’s policy also evinces an important and long accepted secular interest in permitting student freedom of expression, whether the content of the expression takes a secular or religious form. See Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (“Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression.”); Board of Educ. v. Mergens, 496 U.S. 226, 249, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion) (“[P]revent[ing] discrimination against religious and other types of speech” has an “undeniably secular” purpose.); Americans United For Separation of Church and State v. City of Grand Rapids, 980 F.2d 1538, 1543 (6th Cir.1992) (en banc) (“[A] policy of treating religious speech the same as all other speech certainly serves a secular purpose.”).
Nevertheless, the majority opinion and special concurrence suggest that the policy has no “clear” or “legitimate” secular purpose, and posit three pieces of evidence to show that any avowed secular purpose is actually a “sham.” First, the majority says that the School Board promulgated the policy as a means to evade the strictures of Lee; second, the policy’s solely sectarian purpose is said to be established by examining the title of the Reynolds Memorandum, “Graduation Prayer”; and finally, the majority suggests that comments made by some members of the School Board, notably after the policy had been promulgated and distributed in Duval County, likewise evinces a wholly sectarian purpose.
In the process of erecting this argument, the majority opinion, without any authority, ignores the text of the policy and its explicitly stated secular purpose, as if there were none. The majority would divine a wholly sectarian purpose merely by looking at the antecedent history, the title, and the post-enactment debate. It would be an especially dangerous practice if a court could somehow discern legislative purpose, not from the text of the policy, nor from its explicitly stated purpose, nor even from a decision-making body that has offered no debate from which to find purpose, but, rather, simply from the controversy surrounding the subject and the heartfelt and often conflicting views expressed by many members of the community. A review of the pertinent history, however, yields only the observations that Duval County had a long tradition of clergymen offering prayers at commencement ceremonies, that in the wake of Lee in 1992 the School Board terminated the practice, and that thereafter many members of the community expressed strong views about the policy one way or the other. “[Wjhile it is possible to discern the objective ‘purpose’ of a statute (i.e., the public good at which its provisions appear to be directed), or even the formal motivation for a statute where that is explicitly set forth, ... discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed finite.” Edwards v. Aguillard, 482 U.S. 578, 636-37, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting).
In this case we have no record from which to fairly infer the motivation of those who promulgated or distributed the policy. In so far as we attempt to divine purpose from the decision-makers, “to the extent that the School Board was the institutional policy maker (rather than Superintendent Zenke and/or Ms. Reynolds),” the district court found that the “purposes or intentions of the members of the Board *1268 are unknown. No debate was had and no vote was taken on the Reynolds Memorandum of May 5.” Adler I, 851 F.Supp. at 451. To the extent that we focus on the motives of Mr. Zenke or Ms. Reynolds, the district court found mixed motives or purposes — to permit students to solemnize the event, to afford the student body the opportunity to select a messenger, who, in turn would, with complete autonomy, choose a secular or sectarian message, and to afford the students the option of having no message at all. See id. at 452. The majority opinion offers no reason to disturb the district court’s findings which are grounded in the facially neutral language of the Reynolds Memorandum.
The majority opinion also suggests that the title of the Reynolds Memorandum, “Graduation Prayer,” supports the conclusion that the School Board policy was driven solely by sectarian concerns. The title, however, merely introduces the topic of debate within Duval County in the aftermath of Lee, rather than suggesting, let alone compelling, the outcome of that debate. The title affixed to -the Reynolds Memorandum does no more than alert the reader to the general subject matter of the text; but it remains the language and substance of the policy, rather than its title that is controlling. It is altogether unnecessary to requisition the title to cast doubt on the clear and unambiguous purpose of the policy. The crucial term “message” is fully defined by the text of the policy, which provides that the decision whether to have a message is left to the students, that the student body shall choose the student speaker, that the message is limited to two minutes in length, that the message shall take place at the beginning and/or closing of the graduation ceremony, and, finally, that the content of the message shall be prepared by the student speaker without monitoring or review by the School Board. The title cannot take the place of a detailed review of the policy’s facial provisions, let alone create a wholly sectarian purpose out of a textually neutral pronouncement.
Besides being unnecessary, use of the title to inform the plain meaning of the policy’s language is improper. Indeed even if we were examining the title of a statute or legislative codification — and we are doing far less than that here — the Supreme Court has warned that “the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain.” Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). The Eleventh Circuit and its predecessor court have repeatedly employed this principle of statutory construction when interpreting the statutory text. See, e.g., North Ala. Express, Inc. v. Interstate Commerce Comm’n, 971 F.2d 661, 664 (11th Cir.1992) (“Section and chapter titles cannot alter the plain meaning of a statute; they can only assist in clarifying ambiguity.”); Scarborough v. Office of Personnel Management, 723 F.2d 801, 817 (11th Cir.1984) (“[Rjeliance upon heading to determine the meaning of a statute is not a favored method of statutory construction.”); Rich v. Commissioner of Internal Revenue Serv., 250 F.2d 170, 175 (5th Cir.1957) (“[T]he plain and unambiguous meaning of the text of the section cannot be extended by its title or heading.”).
Finally, the majority opinion points to post-enactment comments of some members of the School Board made at a June 1, 1993 meeting as evidence of the School Board’s wholly sectarian purpose to “permit” graduating students to pray. However, the district court observed that “[t]he motivation or intent of the Board relative to the Reynolds Memorandum of May 5 is essentially unknown.” Adler I, 851 F.Supp. at 452. No debate was had and as far as the record reflects, no vote was taken on the Reynolds Memorandum. The June 1st comments were made almost a month after the policy was promulgated and distributed, in the context of a proposal to replace student-initiated messages with a moment of silence. The motion *1269 failed, and the policy was left in force. The most one could say is that the statement of one Board member at the June 1st meeting could be characterized as advocating direct school involvement with religion at graduation ceremonies.[5] Simply put, the post-enactment comments are not sufficient to transform the policy’s express secular purpose into a preeminently religious purpose.
More importantly, regardless of how these 'post hoc statements are interpreted, they cannot be construed to override the policy’s language articulating a clear secular purpose. See Bown v. Gwinnett County Sch. Dist., 112 F.3d 1464, 1472 (11th Cir.1997). Indeed in Bown, this Circuit had occasion to find that the legislative history of a Georgia statute (mandating a period for quiet reflection in public schools), which contained some expressions of religious motives for voting for the Act, could not “override the express statutory language articulating a clear secular purpose.” [6] Id.
In sum, whether standing alone or in concert, the three pieces of evidence cited by the majority cannot strip the policy of a secular purpose. No matter what an individual board member may have hoped— and they said nothing on the record about codifying this policy — Duval County’s policy is facially neutral and undeniably evinces a secular purpose. That is enough to pass constitutional muster under Lemon.
B.
As for whether the policy has the primary effect of advancing religion, I do not see how a policy that on its face strips the School Board of any authority over the central decisions — who speaks, whether there will be a speaker, or what the content of the speech may be — can have the *1270 primary effect of advancing religion in any way. See Doe v. Madison Sch. Dist. No. 321, 147 F.3d 832, 835 (9th Cir.1998), withdrawn & reh’g en banc granted, 165 F.3d 1265 (9th Cir.1999). As the district court found, the implementation of the policy may result in no prayer at all. Adler I, 851 F.Supp. at 454. Indeed, in order to ensure that no one perceives any student’s religious utterance as being the state’s prayer, the policy explicitly divorces any student message from School Board sponsorship.
The Duval County School Board policy does not guarantee that a prayer will be uttered or that religion will be aided; any such result is wholly dependent on a private actor making an autonomous decision to deliver a prayerful message. The Supreme Court has repeatedly upheld facially neutral programs that may permit an individual to support religion. See, e.g., Agostini v. Felton, 521 U.S. 203, 223-232, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (upholding New York program of sending public school teachers into parochial schools to provide remedial education where aid was made available to religious and secular beneficiaries on a nondiscriminatory basis); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 8-12, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (sustaining section of Individual with Disabilities Act providing disabled children with aid regardless of whether a child attends a sectarian institution); Witters v. Washington Dep’t of Servs. for the Blind, 474 U.S. 481, 487-89, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (holding that Establishment Clause not violated when the state paid a blind student’s tuition at a Christian college through a generally-applicable aid program, and observing that aid reach a religious institutions “only as a result of the genuinely independent and private choices of aid recipients”); Mueller v. Allen, 463 U.S. 388, 397-99, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (upholding a state tax deduction for specified educational expenses, and characterizing any such aid to religion as being “only as a result of numerous private choices of individual parents of school-age children”).
C.
For many of the same reasons, I would find that the School Board’s policy does not excessively entangle the Board with religion in violation of the third part of the Lemon test. The policy remains facially neutral with respect to religion, requiring only that graduation messages be voted on by students, and composed and directed by a student speaker. By its very terms, the policy explicitly prohibits any review of the student message at all. Undoubtedly, the School Board would find itself far more entangled with religion if it attempted to eradicate all religious content from student messages than if it maintained a meaningful policy of studied neutrality. See Board of Educ. v. Mergens, 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion); Widmar v. Vincent, 454 U.S. 263, 272 n. 11, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Chabad-Lubavitch v. Miller, 5 F.3d 1383, 1389 (11th Cir.1993) (en banc); Jager v. Douglas County Sch. Dist., 862 F.2d 824, 831 (11th Cir.1989).
While the majority today holds only that the Duval County School Board’s policy is facially unconstitutional, implicit in its rationale is the need for school censorship if schools are to allow students the opportunity to speak at graduation at all. At the core of the court’s holding is “the state’s control over nearly all aspects of the graduation ceremony.” But the degree of control that schools generally exert over high school graduation ceremonies is unlikely to dimmish because graduation ceremonies are, by their nature, highly choreographed. The majority opinion therefore leaves school officials with only two choices: either eliminate student speech altogether or retain student speech, subject to censorship by school authorities. If school officials choose the latter course, they will be left "with the unenviable task of identifying the religious content in student speeches for excision;[7] if, however, they choose the former, they will have deprived the graduation class of any role in shaping its high *1271 school graduation and they will have banned all private student expression. For me, the Establishment Clause requires no such Hobson’s choice. What it does require is a recognition of the critical difference between a private statement of religious values and a religious utterance endorsed by the state. The Duval County School Board’s policy has done no more than that. I would, therefore, affirm the judgment of the district court.
Before: ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, HULL and MARCUS, Circuit Judges.*

. My views are based on Duval County's policy as written, not as applied. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Whether there are serious constitutional questions regarding the application of the policy at certain graduation programs remains to be seen, but I do not think we are in the best position to resolve these issues now. As I understand the procedural history of the case, the district court's consolidation of the action on the merits with the hearing on appellants’ motion for preliminary injunction prevented appellants from fully developing the record for graduation ceremonies after 1993. On May 28, 1998, when it consolidated the action, the district court took judicial notice of its opinion in Adler I, 851 F.Supp. 446 (M.D.Fla.1994). Because the consolidation truncated discovery, the record consists almost entirely of material derived from Adler I. *1258 This record is of little aid to the appellants claiming money damages for injuries sustained at graduation ceremonies in 1995 (Joshua Weihnacht), 1997 (Monica Juodvalk-is), or 1998 (Emily Adler, Seth Finck, Jonathan Rand, and Bonnie Bear), because the manner in which the policy was applied in 1993 and 1994 has no relevance to the appellants' claims for money damages. In Adler II, 112 F.3d 1475 (11th Cir.1997), we stated that ''[w]helher [the students] are entitled to damages depends entirely on the circumstances under which the prayer was delivered at their graduation ceremony.” Id. at 1479-80. Thus, in order to recover monetary damages, an appellant needs to demonstrate that the prayer given at his or her graduation ceremony was delivered in an unconstitutional fashion, regardless of whether the policy itself is unconstitutional. See id. at 1479. I don’t believe this analysis can be made as the record now stands. Therefore, I agree with the majority opinion that whether the policy passes facial constitutional muster or not, the case should be remanded to allow appellants to pursue discovery on events occurring after 1993, and to permit the district court to conduct a factually based as-applied analysis. See, e.g., Bowen v. Kendrick, 487 U.S. 589, 591, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

. The other cases that have considered student-initiated prayer at graduation are of limited assistance; none, except for Doe v. Madison School District No. 321, examine a policy which mirrors Duval County’s in its neutrality. Notably, all of the other cases allow for students to vote directly on whether or not to have prayer at graduation. These cases either uphold or strike down such policies. Jones v. Clear Creek Independent School District, 977 F.2d 963 (5th Cir.1992), is the only case which has permitted students to vote directly on whether to have prayer at graduation. In Jones, the Fifth Circuit upheld the Clear Creek, Texas school district's policy allowing *1262 students to decide if they wanted volunteers to deliver '‘nonsectarian and nonproselytiz-ing” invocations at graduation. See id. at 965. The court found that the Clear Creek policy reserved to the students the decision whether to have an invocation, precluded anyone but a student volunteer from delivering an invocation, and placed less psychological coercion on students than the prayers had on graduates in Lee because students were aware that any prayers given represented the will of their peers. See id. at 970-71.
The Fifth Circuit recently revisited the issue of student-initiated prayer in Doe v. Santa Fe Independent School District, 168 F.3d 806 (5th Cir.1999). There the Fifth Circuit examined what it considered to be the holding of Jones — "that student-selected, student-given, nonsectarian, nonproselytizing invocations and benedictions at high school graduation ceremonies” are constitutional — and concluded that the constitutionality of a Clear Creek-type prayer policy depends on its "nonsectarian and nonproselytizing” features. Santa Fe, 168 F.3d at 811. The majority opinion relies on Santa Fe for the proposition that a policy which "permits” sectarian and proselytizing prayers is a priori unconstitutional. This argument proves too much and is offensive to the Constitution. The Duval County policy, of course, permits sectarian and proselytizing prayers because it places no limitations, either secular or sectarian, on the content of a graduation message. A policy of free expression is far more consonant with the commands of the First Amendment than is a policy of censorship. See, e.g., Board of Educ. v. Mergens, 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion) ("[A] denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur.”); Santa Fe, 168 F.3d at 824-28 (Jolly, J., dissenting).
In ACLU of New Jersey v. Black Horse Pike Regional Board of Education, 84 F.3d 1471 (3d Cir.1996) (en banc), the Third Circuit, sitting en banc, held unconstitutional a school board’s policy that permitted the senior class to vote on whether to include a prayer at high school graduation ceremonies. See id. at 1477-88. The policy in Black Horse Pike allowed senior class officers to conduct a poll of the graduating class to determine, by plurality vote, whether seniors wanted "prayer, a moment of reflection, or nothing at all” to be included in their graduation ceremony. Id. at 1475. Finally, in Harris v. Joint School District No. 241, 41 F.3d 447 (9th Cir.1994), vacated as moot, 515 U.S. 1155, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995), the high school students voted by written ballot on whether or not to have prayer, and, if the students voted for prayer, on whether a minister or a student would say the prayer. See id. at 452-53. The Harris court found that the state involvement in the case was pervasive enough to offend Establishment Clause concerns. The court noted that "[t]he message of the speakers is ... chosen by the majority; the relevant speakers are instructed to pray.” Id. at 456-57.
In contrast to each of these policies, Duval County students vote on whether to have a message of unspecified content delivered by a student. This is the critical distinction.

. Simply providing a platform on a neutral basis is not enough to convert private action into state action. In a series of cases granting religious groups access to generally available facilities or benefits, i.e., "open forum" cases, the Supreme Court has suggested that the mere location or platform of religious speech is insufficient to transform private speech into the state’s speech. The Court has, on numerous occasions, rejected the argument that the Establishment Clause allows restrictions on access by religious organizations to government programs or premises, otherwise open to all groups. By providing students who hold religious views with the same opportunity to enjoy generally available facilities and benefits, schools act neutrally. See Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 832, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that the University of Virginia violated the Free Speech Clause when it refused to pay for a religious student organization’s publication costs under a program that funded other student organization publications); Lamb’s Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (striking down as violative of the Free Speech Clause a school district regulation authorizing use of school property for political, social, civic, or recreational uses but denying religious groups the same access); Board of Educ. v. Mergens, 496 U.S. 226, 235, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (upholding Equal Access Act prohibiting public secondary schools which have a "limited open forum” from denying access to students who wish to meet in that forum "on the basis of the religious, political, philosophical, or other content of the speech at such meetings”); Widmar v. Vincent, 454 U.S. 263, 273-74, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (holding that a university regulation denying religious groups access to school facilities violated the Free Speech Clause; any benefits to religion by providing "equal access” to facilities would be "incidental”).

. Duval County students possess Free Speech rights, even in a nonpublic forum such as a graduation ceremony. The Supreme Court has held that in nonpublic fora the government may not engage in viewpoint discrimination. See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.”); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (A "state may reserve [nonpublic] forum for its intended purposes ... as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.”). The Court has stated that religion provides “a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.” Rosenberger, 515 U.S. at 831, 115 S.Ct. 2510.

. The majority opinion offers four post-enactment statements of School Board members to show that the School Board intended to permit graduating students to engage in prayer. In fact, the statements to which the majority refers generally buttress the conclusion that the School Board's policy was not a sham. Of those four statements, only the statement of Board member Bill Parker can be characterized as advocating direct school involvement with religion at graduation ceremonies. See Tr. of Duval County Sch. Bd. Meeting at 2 ("I think that our school principals should be allowed to work out a non-sectarian message with our student chaplains, or a guest minister, rabbi or whatever that would be acceptable to all at this very important time in our young people's lives.”). The statements of Don Buckley and Nancy Corwin, while generally supportive of religion, acknowledge that an intended effect of the policy is to insulate the content of messages from school influence. See id. at 5 (Buckley) (“I think the only way we can keep ourselves clear on this thing is to keep ourselves out of what happens in this area of the graduation ceremony.”); (Corwin) ("I also believe that the democratic process in which seniors were given the ability to choose which form of inspirational message, if any, they wanted at their commencement was an appropriate one and I'm going to stand by it.”). Rather than betraying an illegitimate intent to ensure that prayer take place at graduation ceremonies, these statements indicate that Buckley and Corwin perceived the School Board policy as disassociating the school hierarchy from student messages. The fourth statement referenced by the court, that of Board member Stan Jordan, was also supportive of the policy. See id. at 8 ("I plan to vote for the administration plan and against the proposal that’s on the table.”). Taken as a whole these utterances by School Board members constitute recognition that the old regime of state-directed school prayer in Duval County had passed and been replaced by a new regime over which they had far less control.

. The majority opinion’s reliance on Jager v. Douglas County School District, 862 F.2d 824 (11th Cir.1989), as controlling, or at least informing the secular purpose inquiry in this case is misplaced. It cites Jager for the proposition that when a policy's “actual purpose" is religious, or “intrinsically religious,” id. at 830, it cannot meet the secular purpose prong of Lemon. But Jager does no more than state the obvious, that in order to meet Lemon’s first prong, a government policy must have a genuine secular purpose and not be a sham. See Edwards v. Aguillard, 482 U.S. 578, 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). If a policy's "actual purpose” is wholly religious then Lemon's secular purpose requirement is not satisfied. In Jager, we held that a school district's practice of having representatives of student organizations deliver invocations pri- or to football games had as its “preeminent purpose” the endorsement of Protestant Christianity. 862 F.2d at 830. The only discretion left to the students was the selection of who would pray.

. There is no easy or precise guideline for school officials to follow when excising student speech of religious content. The constitutional definition of religion is expansive; it *1271 encompasses "all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinated or upon which all else is ultimately dependent” and “which occupies in the life of its possessor a place parallel to that filled by [ ] God." United States v. Seeger, 380 U.S. 163, 176, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). Moreover, the belief “need not be acceptable, logical, consistent, or comprehensible to others.” Thomas v. Review Bd., 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Indeed, if the School Board's censorship is not "rigorous” enough and thereby allows religion to creep into graduation ceremonies, a policy of allowing monitored student speech may still be subject to constitutional attack.